**TRINITY & FARSIOU, LLC**
**Steven D. Farsiou, Esq. (026442000)**
**47 Maple Ave., Suite 7**
**Flemington, NJ  08822**
**(908) 824-7265 Telephone**
**(908) 968-3891 Fax**
**Attorneys for Plaintiff, Scott Illiano**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
**NEWARK VICINAGE**

| | |
|---|---|
| SCOTT ILLIANO,<br><br>Plaintiff,<br><br>v.<br><br>WAYNE BOARD OF EDUCATION; MICHAEL REWICK, Individually and in his Official Capacity; MARK TOBACK, Individually and in his Official Capacity; JEFF DILOLLO, Individually and in his Official Capacity; CATHERINE KAZAN, Individually and in her Official Capacity; WAYNE HILLS BASEBALL BOOSTER CLUB;; PAM O'MEALY, Individually and in her Official Capacity; MELISSA CASAMASSINA, Individually and in her Official Capacity; KATHERINE D'AGATI, Individually and in her Official Capacity; JOHN/JANE DOES 1-5, fictitious individuals and ABC ENTITIES 1-10, fictitious entities,<br><br>Defendants. | **:** HON. SUSAN D. WIGENTON, U.S.D.J.<br>**:**<br>**:** CIVIL ACTION NO. 2:22-114 (SDW-JBC)<br>**:**<br>**:**<br>**:**          **CIVIL ACTION**<br>**:**<br>**:**     **FIRST AMENDED COMPLAINT**<br>**:**<br>**:**<br>**:**<br>**:**<br>**:**<br>**:**<br>**:**<br>**:**<br>**:**<br>**:**<br>**:**<br>**:**<br>**:**<br>**:**<br>**:**<br>**:**<br>**:**<br>**:**<br>**:**<br>**:**<br>**:**<br>**:**<br>**:** |

Plaintiff, Scott Illiano ("Plaintiff"), currently resides at 104 Lakeview Court, Pompton Lakes, NJ 07442, by way of Complaint against Defendants, Wayne Board of Education ("Defendant Board"), Michael Rewick ("Defendant Rewick"), Mark Toback ("Defendant Toback"), Jeff DiLollo ("Defendant DiLollo"), Catherine Kazan ("Defendant Kazan") [1]; Wayne Hills Booster Club ("Defendant Booster Club"), Pam O'Mealy ("Defendant O'Mealy"), Melissa Casamassina ("Defendant Casamassina"), Katharine D'Agati ("Defendant "D'Agati") [2] says:

## THE PARTIES

1.    At all relevant times, Plaintiff was the head baseball coach at Wayne Hills High School.

2.    Defendant Board is a public entity that oversees the activities of the Wayne Township District schools and its employees.

3.    Defendant Rewick is currently and at all relevant times Wayne Hills High School's Principal.

4.    Defendant Toback is currently and at all relevant times the Superintendent of the Wayne Hills School District.

---

[1] Defendant Board and Defendants Rewick, Toback, DiLollo and Kazan will be collectively referred to as "School Defendants."
[2] Defendant Booster Club and Defendants O'Mealy, Casamassina and D'Agati will be collectively referred to as "Booster Defendants."

5.    Defendant DiLollo is currently and at all relevant times the Assistant Principal of Athletics and Activities at Wayne Hills High School.

6.    Defendant Kazan is currently and was at all relevant times the President of the Defendant Board;

7.    Defendant Booster Club is an entity that is organized for the purpose of endorsing and supporting the baseball program at Wayne Hills High School.

8.    At all relevant times, Defendant O'Mealy was the President of the Defendant Booster Club.

9.    At all relevant times, Defendant Casamassina was the Vice President of the Defendant Booster Club.

10.  At all relevant times, Defendant D'Agati was the Secretary of the Defendant Booster Club.

11.  Defendants, John/Jane Does 1-10, are fictitious names of individuals who aided in, participated in, conspired to commit, facilitated, abetted or are otherwise liable for the actions complained of herein whose identities have not yet been discovered.

12.  Defendants, ABC Entities 1-10 are fictitious names for entities whose identities have not yet been determined who directly and/or through their agents, employees and/or officers participated in, aided, abetted, supervised, permitted, allowed, directed and/or condoned the acts and/or omissions complained of herein.

3

## FACTS RELEVANT TO ALL COUNTS

13.  Plaintiff is one of the most respected baseball coaches in the State. He has amassed 365 wins in his career and has successfully transformed the baseball programs at West Essex High School, Caldwell High School and Wayne Hills High School. In doing so, Plaintiff has always run his baseball programs pursuant to the laws of New Jersey and pursuant to the regulations of the New Jersey State Interscholastic Athletic Association ("NJSIAA").

14.  Plaintiff was hired by former Athletic Director, Richard Portfido, with the approval of Defendant Rewick and the Defendant Board in November 2017.

15.  At the time of Plaintiff's hire, the Wayne Hills High School baseball program was in a state of disarray, including 5 coaching changes in 6 years.

16.  Plaintiff is required, like every other head coach in the district and in the State, to follow a job description. Listed on the Applitrak system, which is followed by schools in New Jersey, is a job description for Wayne Hills extra-curricular positions specific to the particular position. Job descriptions for head coaching positions are identified a "C-332."

17.  In this respect, the job goals are outlined as, "[t]o assume primary responsibility for leadership, supervision, and organization of a specific athletic activity to carry out the

4

objectives of the District Athletic Program, the Conference, and the N.J.S.I.A.A."

18. Listed within the specific job description in C-332, in pertinent part, are the following guidelines:

- #3 Head coach shall be responsible for up-to-date knowledge of conference, and state rules, and for ensuring that the head coach and assistants abide by such rules at all times.

- #7 Head coach shall recommend to the AD and Principal personnel for assistant coaching positions.

- #22 Head coach shall be responsible for supervising all locker rooms and securing all facilities at the close of each practice/contest.

- #27 Head coach keeps the Director of Athletics informed of program developments and problems as they occur throughout the season.

19. Upon his hire, Plaintiff was advised by Mr. Portfido and Defendant Rewick that there was a volatile parent faction led by one ring leader, Jim Sanfilippo.

20. At the time of his hire, the baseball team at Wayne Hills High School was coming off a losing season with a record of 11 wins and 16 losses.

21. During his interview, Plaintiff was told by Mr. Portfido and Defendant Rewick that they would support his efforts to fundraise in order to overcome a miniscule budget of approximately $3,500.

22. While touring the baseball field, Mr. Portfido told Plaintiff that he could subsidize his coaching staff through booster funds as other Wayne Hills sports programs did in order to overcome the

unusual shortage of paid assistant positions as there were only 2 in the entire program.

23.  Within days of taking the job, Defendant Booster Club member, Jim Palumbo, contacted Plaintiff to welcome him to Wayne Hills but more importantly, to encourage Plaintiff to utilize a baseball training facility that Mr. Palumbo worked at called PS2.

24.  PS2 was a training facility in Wayne, and Mr. Palumbo wanted Plaintiff to endorse PS2's winter training program to the team.

25.  Plaintiff indicated that he would not endorse any one program but instead would provide the players options for their winter training. Mr. Palumbo was not happy with Plaintiff.

26.  Plaintiff followed the head coach guidelines, and in the end, he was terminated from his head coaching position because he kept his superiors informed and up to date when problems occurred with the defendant Wayne Hills Baseball Booster Club.

27.  Throughout his career, Plaintiff emphasized that no player was to be left alone. This Golden Rule was put into place to assure that his students were properly supervised at all times as outlined in his performance responsibilities (C-322) and to avoid any tragic circumstances such as the well-publicized hazing incidents in New Jersey that occurred at Sayreville High School and Wall High School. In fact, the Wall Township Board of Education is currently paying extra staff to supervise locker rooms at all times after

suspending and firing both coaches and administrators for their failure to properly supervise their students at all times.

28. Plaintiff faced a significant challenge in assuring proper student supervision at all times because the Defendant Board only pays 2 assistant coaches while most any other Group 3 High School pays at least 3 assistant coaches.

29. Further, Plaintiff's staff consisted of only one in district staff member, Rich Basilicato. All other members of his staff were either employed in other school districts or employed in another profession outside of education. Therefore, Plaintiff had to hire extra staff to assure that his students were supervised at all times because both Plaintiff and other members of his staff were contractually bound to other schools at the conclusion of their school day. For example, Plaintiff could not arrive on campus until roughly 3:25 p.m. and JV Coach Mike DiChiarra could not arrive on campus until 3:45 p.m. However, Wayne Hills dismissed their students at 2:19 p.m. and they needed to assure proper supervision in the locker room areas, buses, and fields for all three levels of his baseball program. Therefore, in order to meet Performance Responsibilities (#22), Plaintiff had to hire more staff.

30. Plaintiff did not complain to Defendant Toback or to the Defendant Board about the shortfall of paid assistant support staff at the time he was hired. Instead, he led a successful fundraising

initiative with no help, assistance, or effort from the Booster Defendants while protecting the Defendant Board's budget.

31.  The National Federation of State High School Associations (NFHS) is the governing body for all high school sports nationwide. NFHS has specific guidelines for booster clubs that booster club members must follow.

32.  The NFHS Guidelines for booster clubs specifically state that booster clubs should "financially support the program by providing additional funding for coaches, staff as approved by the head coach and athletic director."

33.  Importantly, NFHS grants this authority to the coaches and athletic directors to protect and insulate coaches from losing support staff in the event that a disgruntled parent(s) should become a booster officer, and requiring approval from the Athletic Director provides oversight in the form of checks and balances for such expenditures. It is unrealistic to expect coaches to put a consistent support staff in place year-after-year contingent only upon which parent may or may not be elected as a booster officer during some annual election.

34.  Plaintiff received approval to subsidize his staff from both athletic directors that he worked for at Wayne Hills including Rich Porfido and Defendant DiLollo. The issue of proper supervision of his players was discussed at length with both Mr. Porfido and Defendant DiLollo.

35.   Since the Defendant Board offered only 2 paid assistant coaching positions and 5 assistant coaches were required for proper supervision from the time students were dismissed from school until their parents picked them up and the facilities were locked and secured as stated in Plaintiff's job description, both Athletic Directors explained to Plaintiff that volunteer coaches were prohibited from supervising children while riding school buses so they would have to get all 5 assistant coaches formally approved by the Defendant Board for only a fraction of a full paid stipend so each staff member could have legal authority over students while riding a bus.

36.   Since the 5 assistant coaches were only being paid a fraction of a stipend by the Defendant Board, both Porfido and Defendant DiLollo were well aware of and approved the subsidizing of assistant coaches using booster funds as permitted and encouraged by NFHS Guidelines for booster clubs. Thus, this agreement covered the Defendant Board from a liability standpoint while buses were in transit and the coaches would be remunerated beyond just a partial or fractional stipend through Plaintiff's fundraising efforts.

37.   In January 2018, Plaintiff was invited to a Defendant Booster Club meeting which he attended.

38.   Prior to the regular meeting, Plaintiff attended an executive board meeting for the Defendant Booster Club. The executive board

9

involved 7 Trustees beyond a traditional President, Vice President, Secretary, and Treasurer comprising of 11 total members. An 11-member executive board is largely unheard of for a high school booster club.

39. At this executive meeting, Plaintiff provided the members with his 3 phase, 12-month plan to rejuvenate the program.

40. During the meeting, the executive board offered their full support and resources in support of Plaintiff to assemble a full and complete coaching staff for the purpose of both supervision and top flight preparation in an effort to turn the program around.

41. Upon taking over the position, Plaintiff learned that he would be operating on a shoestring budget of approximately $3,500 from the Athletic Department. Therefore, he turned to the Booster Club and made purchase requests for equipment in the interests of both student safety and preparation. In January 2018, Plaintiff became aware that the long turnaround time he observed was due to the fact that the Booster Club Trustees created an anonymous voting system for all purchase requests. This voting process is unheard of and caused Plaintiff to request a copy of the Defendant Booster Club bylaws.

42. After reviewing these by-laws, Plaintiff became concerned about what he read and raised these concerns at Defendant Booster Club meeting. In addition to the unheard of 11-member Executive Board member panel, Plaintiff's concerns were that (1) a vote was

required to fulfill any purchase requests made by the head coach and (2) the voting process was anonymous. This was not a usual practice by any Booster Club. It was even more alarming to Plaintiff that these significantly flawed booster club by-laws were never approved by the Defendant Board as required by Board policies.

43. Since Plaintiff would have to rely on booster funding for both essential purchases of team equipment and to subsidize a qualified coaching staff in order to assure that students would be supervised at all times as outlined in his job description, the unapproved and flawed by-laws transferred the balance of power in the baseball program from the coaching staff to the parents, which is in direct violation of NFHS Rules.

44. In accordance with Plaintiff's performance responsibilities, he reported this problem initially to Athletic Director Rich Porfido and then to Defendant DiLollo on multiple occasions both verbally and in writing.

45. Plaintiff reported that the by-laws were never approved by anyone affiliated with the school or the Defendant Board which is required pursuant to Board Policy 0131. Since the Defendant Board did not adopt the by-laws and have the Defendant Booster Club follow Board Policy 9191 the ensuing infractions by the Defendant Board occurred:

- Board Policy 9191 states because the activities of the booster clubs also reflect on the district, the board establishes guidelines for the operation of booster clubs in order to ensure that their activities assist in the attainment of district goals and objectives.

- The baseball booster club did not file a copy of the certificate of formation as per Board Policy 9191. Therefore, the Defendant Board is negligent in their duty to abide by their own policy 9191.

- The Defendant Board violated their own Policy 9191 by not obtaining a contract from the Baseball Booster Club for it to conduct district activities.

- The Defendant Board violated their own Policy 9191 by not obtaining a certificate of insurance from the Baseball Booster Club to indemnify the Board from any lawsuits against the district. In an effort to cover for their own violation of Policy 9191, the Defendant Board has subsequently used taxpayer funds to provide the Booster Defendants free legal defense through their insurance carrier in an effort to assist the very same parents who violated their own Board policies and state regulations.

- Defendant Toback violated his own Board Policy 9191 by never signing off or granting written approval for the Defendant Booster Club to raise funds in the name of the district.

- By failing to ever review or approve the booster club bylaws the Defendant Board is negligent in their duty to abide by their own Board Policy 0131 which specifically states the Board of Education shall exercise its rule-making power by adopting, revising, and abolishing by-laws, policies and regulations for the organization and operation of the school district.

- Board Policy 0131 also reads, "bylaws, policies and regulations may be adopted and revised at any meeting of the Board provided the proposed adoption or revision has been approved by the board at a previous meeting.

- A recommendation for a new or revised bylaw, policy, or regulation shall be recommended to the board and or superintendent.

12

- All proposed new and revised bylaws, policies, and regulations shall be submitted to the superintendent or designee and will review all new and revised draft bylaws, policies, and regulations prior to the board receiving a draft of new or revised bylaws, policies, or regulations for board consideration.

- The proposed draft bylaw, policy, or regulation approved by the board on first reading will be submitted for adoption at a succeeding meeting of the Board. Revisions in the draft may be made at any meeting prior to adoption by a simple majority vote of the board. A change that is merely editorial may be followed by a vote to adopt the new or revised bylaw policy, or regulation on second reading.

46. NFHS Guidelines for Booster Clubs mandate that booster club members must "Listen and work closely with the head coach." From the time Plaintiff began in his role he observed that not only was this not happening, but the lack of transparency being perpetuated by the anonymous voting system led to a series of underhanded behavior and created a bizarre culture of secrecy within the booster club where they did not involve Plaintiff in their operations or keep him informed of booster related activities. This was also a clear violation of Defendant Board Policy #9191 and NFHS Guidelines for Booster Clubs.

47. Thereafter, in June 2018, an end of the season team banquet was held at the Wayne Country Club. The banquet is held under the auspices of both the high school and the baseball program where Plaintiff honored the players who participated in his program while distributing awards and varsity letters purchased and paid for by the Defendant Board. Neither Plaintiff nor the School Defendants

13

were made aware of the planning of this event. In addition, alcohol was being served at this event and as this consumption continued, the parents became loud, boisterous and were slurring their words. Plaintiff reported this conduct to then Athletic Director Mr. Portfido the next day as this was not only a violation of Defendant Board Policy # 9160, but the Defendant Board was negligent in requiring the Defendant Booster Club to certify adherence to all school policies as mandated by Defendant Board Policy #9191.

48. Throughout the 2019 season, Plaintiff was subjected to rampant dysfunction on behalf of the Defendant Booster Club including but not limited to:

- The Booster Club's own by-laws stated that they were to follow Robert's Rules in their governance. They did not follow Robert's Rules as they kept no minutes to their meetings.

- They improperly installed turf in the school batting cage without any notice to Plaintiff or the permission of the school.

- They repeatedly meddled into what facility Plaintiff may recommend for the team to use for their Winter training program.

- They attempted to fire one of plaintiff's long time fundraising vendors behind his back in an act of cronyism in an effort to hire a friend of theirs who lived in town.

- Cloaked in their secrecy, the Defendant Booster Club continued to improperly control the baseball program and delay much needed purchases for the team including ordering new equipment, new uniforms, and hats which almost didn't arrive in time for the start of the season.

- The former Booster Club President, Alicia Disteso, approached Plaintiff on the field and stated that there were some things she did not want to put in writing, but the Booster Club had actually taken a vote whether or not the team should conduct a practice on a day that Plaintiff scheduled a Team Fundraiser.

- They mistreated school maintenance staff as they disapproved of how they prepped the field and even contacted members of other schools and Plaintiff late one evening to try and schedule games.

- After the last game of the 2019 season, Treasurer Dave Reicher improperly took the team's sound system purportedly for his own personal or family use after being told by Assistant Coach Matt Vickers not to. Before just walking off with it, he stated that "the speaker was ours and not yours." The Us vs You type of divisiveness greatly concerned Plaintiff and contrasts with NFHS Guidelines to listen and work closely with the head coach.

- At the conclusion of the 2019 season the Defendant Booster Club further violated Robert's Rules and their own by-laws by failing to hold an annual election. After electronically sending out a rule that did not exist in their by-laws that prohibited other parents from running for the office of President, the Booster Defendants just appointed themselves to their positions via group text and were announced to Plaintiff's surprise by the outgoing President at the annual team banquet.

- During this banquet, alcohol was once again served and parents were over indulging.

49. This conduct demonstrates the lengths the Defendant Booster Club took in its attempt to run the program and usurp the head coach and his authority. This was parental interference and dysfunction at a level that has never been seen. In fact, according to the Wayne Hills Head Baseball Coach Performance Responsibilities (#18 C-322), the head baseball coach "shall

15

provide supervisory control over all phases of team activities including freshman, sophomore, and junior varsity."

50.   During the summer of 2019, a change of leadership occurred as Defendant DiLollo replaced Mr. Porfido as Athletic Director. Plaintiff was aware this change of leadership was coming and needed administrative support relative to his performance responsibilities (#27 C-322). He waited for DiLollo to formally take over to disclose the improprieties which were taking place.

51.   In July 2019, Plaintiff met with Defendant DiLollo in his office and reported the rampant dysfunction within the Defendant Booster Club. He asked Defendant DiLollo to help him bring the Defendant Booster Club into compliance with both Board Policy #9191 and NFHS Guidelines for Booster Clubs.

52.   The entire history was explained to Defendant DiLollo, which included the fact that the Defendant Booster Club created bogus by-laws which provided the Defendant Booster Club unauthorized power over a school-sponsored program and permeated a bizarre culture of secrecy in violation of Defendant Board Policy 9191 and NFHS Guidelines.

53.   Plaintiff provided Defendant DiLollo a breakdown of the improprieties of the by-laws from the excessive board membership to the fact that no piece of equipment could get to the staff without first passing through their 11-member panel secret vote. Significantly, Plaintiff reported that the by-laws were never

16

approved by anyone affiliated with the school or the Defendant Board as required by Board Policies 0301 and 9191.

54.  Defendant DiLollo expressed his shock and agreed that the Defendant Booster Club was not compliant with Board Policy 9191 nor were they operating under the parameters set forth under NFHS Guidelines.

55.  Of important concern to Plaintiff was the continued sale and consumption of alcohol that had once again been served at the team banquet for the second consecutive year. Plaintiff reported this infraction to Defendant DiLollo. Plaintiff also reported to Defendant DiLollo that parents were over indulging and a clearly inebriated parent got in Plaintiff's face about his son's batting average on the JV team.

56.  Defendant DiLollo assured Plaintiff that he would look into the issues with the Defendant Booster Club and get them resolved.

57.  In spite of NFHS federation guidelines that require booster members to "listen and work closely with the head coach," the Booster Defendants planned a covert meeting with Defendant DiLollo wherein the Booster Club Officers specifically requested in writing that Plaintiff be excluded from the meeting. They expressed a desire to discuss Plaintiff's role in fundraising as the head coach of the baseball program.

58.  This meeting took place on October 6, 2019. In an effort to bring the Defendant Booster Club into compliance with both Board

Policy 9191 and NFHS Guidelines, Defendant DiLollo requested evidence from the Booster Club Officers of their elections, which did not exist.

59.  Based on being excluded from the meeting, Plaintiff wrote an email to Defendant DiLollo dated October 7, 2019 providing background on Plaintiff's fundraising and the fact that his fundraising program set a record at the school during Plaintiff's first year as the head coach. Plaintiff also provided his position as to the head coach's role in fundraising which was vital to assure student supervision mandated by C-322 with very little help from the Defendant Board.

60.  On October 13, 2019, Plaintiff forwarded Defendant DiLollo a copy of the Defendant Booster Club by-laws electronically and asked for help in rectifying the situation.

61.  On October 18, 2019, Defendant DiLollo replied to an email from Defendant O'Mealy and requested a copy of the booster club by-laws, financial statements, and meeting dates and related minutes.

62.  Board Policy #9191 requires the Booster Club to submit annual financial reports to the School Business Administrator. Business Administrator Bill Moffit and the Defendant Board is in violation of their own Policy #9191 for never obtaining these financial records as required, and in the process, they were negligent in

assuring that the booster club's end-of-year balance was compliant with New Jersey law not to exceed $4,500.

63. Had the Defendant Board followed its own Policy 9191, the booster club's financial records would already be on file in the Defendant Board office. Since they failed to follow it, Defendant DiLollo had to find the information but his request was completely ignored by the Defendant Booster Club and he was later advised that no response was given because after conducting an internet search, they found no authority that required the Defendant Booster Club to provide such information to the Athletic Director despite the fact that Defendant DiLollo was the administrator in charge of a school athletic program that their sons participated in, and despite the fact that Board Policy 9191 required the Defendant Booster Club to enter into a contract with the Board of Education.

64. Notwithstanding this, none of the requested information was provided because no such information existed.

65. In addition, Defendant DiLollo advised he did a search on the IRS website and the Defendant Booster Club's 503(c) tax exempt status had expired.

66. Business Administrator Moffit and the Defendant Board were negligent in not obtaining evidence that the Booster Club's 501(c) status was still active.

67. On October 28, 2019, which was 34 days after the Booster Club Officers requested to meet with Defendant DiLollo without

Plaintiff and 10 days since Defendant DiLollo mandated the Booster Club Officers to provide the appropriate documentation as to the Defendant Booster Club operations, Plaintiff was invited to meet with them to discuss the baseball season.

68.   Plaintiff advised Defendant DiLollo of this meeting.

69.   Defendant DiLollo told Plaintiff to not reply or accept the invitation until the proper documentation was provided as per Defendant DiLollo's previous request as mandated by Policy 9191. This edict drove a further wedge between Plaintiff and the Defendant Booster Club.

70.   When Plaintiff sensed that Defendant DiLollo had not done anything yet to rectify the issues, he re-sent his October 13, 2019 email he sent to Defendant DiLollo requesting help with the Defendant Booster Club issues and the unauthorized and unsanctioned by-laws.

71.   On November 5, 2019, Plaintiff received another email from the Defendant Booster Club to meet. As per the directions of Defendant DiLollo, Plaintiff did not reply.

72.   On November 22, 2019, the Director of Secondary Education, Maureen Weir, advised via email that she will not permit parents to run or ruin the baseball program, specifically stating we will not let parents "coup another coach." She also gave Plaintiff her support to help turn this situation around for the better.

73.  Plaintiff was advised by Defendant DiLollo that Defendant DiLollo had told Ms. Weir about this situation so she knew what was going on. Ms. Weir also confirmed in writing that she would speak with Defendant Toback and Business Administrator Moffit.

74.  Weir's email states that this was not the first time Wayne parents tried to run a coach out of town as evidenced by the rampant turnover in the position, but it also confirms that the Central Office staff including Defendant Toback were now well aware of the attempted smear campaign being orchestrated at Plaintiff by the Booster Defendants.

75.  Given the seriousness of Weir's written statement, Defendant Toback, Moffit, and the Defendant Board were obligated to protect Plaintiff based upon Board Policy 0120 (Educational Planning) which states "The Board is responsible for requiring and acquiring reliable information from responsible sources that will enable it and the staff to work toward the continuing improvement of the educational program." The Board shall exercise its powers through the legislation of bylaws and policies for the organization and operation of the school district. Further, Board Policy 0142 and the NJSA 18A: 12-24 Code of Ethics for Board Members mandates all members of a school board to support and protect school personnel in proper performance of their duties.

76.  On November 26, 2019, now 39 days since Defendant DiLollo's request to the Defendant Booster Club and still no response as to

21

the documentation Defendant DiLollo requested to determine if the Defendant Booster Club had been adhering to school policy. Based on this, Defendant DiLollo sent an email on this date dissolving the Defendant Booster Club and requested that all monies remaining in the account be turned over to him.

77. Defendant DiLollo confirmed in the email that Defendant Rewick approved this measure.

78. The next day, November 27, 2019, after two years of meddling, interference, arguing, complaining and lobbying on behalf of parents over what facility should handle the winter training, Plaintiff sent an informational email to all the returning players about Player's Edge in Wayne. Plaintiff thought it may be a good idea to use a new facility to start anew. This facility is owned by Dan Gilligan, a parent of two freshman twin boys entering the baseball program. The appeal of Player's Edge was the qualification of the staff and the high-end equipment used that provided metrics such as launch angle and exit velocity. The other facilities did not have this. Mr. Gilligan offered the families a reduced rate and the convenience of being right in town as some prior complaints centered around the commute time to one of the other winter workout facilities. It was made clear in both the subject heading and the body of the email that this was a "voluntary program" and not a mandate.

79.  On December 3, 2019, the unsanctioned Booster Club Officers sent an email to Defendant DiLollo pleading ignorance, offering a financial record from 2018-2019, and requested a meeting that included Plaintiff this time.

80.  On December 4, 2019, Plaintiff sent an email to Defendant DiLollo regarding some of the purchases that he just learned about after viewing the financial record from 2018-2019 which were never previously made known to Plaintiff at the time of purchase, once again disregarding NFHS Guidelines of working closely with the head coach.

81.  On December 6, 2019, Defendant DiLollo responded to the Booster Club Officer email and invited them to a meeting with him and Defendant Rewick.

82.  On December 8, 2019, the Booster Club Officers sent an email to Defendant DiLollo requesting a different date for the meeting which was clearly done to re-activate their expired tax-exempt status.

83.  On December 13, 2019, Defendant DiLollo and Defendant Rewick met with the unsanctioned Booster Club Officers. The meeting was recorded and documented. According to the official minutes, the discussion covered why Plaintiff was not included in Booster Club meetings, why the Defendant Booster Club did not keep minutes, why the Defendant Booster Club refused to provide the documentation that Defendant DiLollo requested and some other issues.

23

84.  The minutes also demonstrate that Defendant DiLollo advised that there is a process for the Defendant Booster Club to be created, suspended, removed and reinstated.

85.  Amazingly, Defendant Casamassina, the now unsanctioned Vice President of the Defendant Booster Club, falsely claimed that there were no by-laws. This completely contradicted what Defendant O'Mealy (the President) had previously stated in an email deterring other parents from opposing her while running for the candidacy of President.

86.  It was clear that the Defendant Booster Club wanted to use the by-laws to their benefit and then deny their existence when asked about them.

87.  After the meeting, Defendant DiLollo conferred with both Defendant Rewick and Cavins and then wrote a letter to Defendant Toback, Business Administrator Moffet, and Director of Secondary Education Weir wherein he expressed his concerns as to the Defendant Booster Club, all of whom were obligated to take action in accordance with Board Policy 1020 (Authority and Powers), 2. Educational Planning, reads, "The Board is responsible for requiring and acquiring reliable information from responsible sources that will enable it and the staff to work toward the continuing improvement of the educational program."

88.  The Defendant Board shall exercise its powers through the legislation of by-laws and policies for the organization and

operation of the school district as required by Board Policy 0120 (Authority and Powers).

89. Specifically, Defendant DiLollo stated that he saw no legitimacy as the officers were never actually elected and therefore, did not have any right to take any action.

90. He also noted that the Defendant Booster Club was carrying a balance that far exceeded the NJ law of $4,500 by $12,000.

91. Therefore, in an effort to finally bring the Defendant Booster Club into compliancy with both Board Policy 9191, the NFHS Guidelines for Booster Clubs and New Jersey law, Defendant DiLollo in collaboration with the 5 other aforementioned Defendant Board agents drew up terms and conditions in the form of a contract as required by Policy 9191.

92. The terms and conditions of the contract temporarily suspended the Defendant Booster Club and recommended that the dollar balance legally permitted by New Jersey law ($4,500) be placed in an account belonging to the Defendant Board. He also recommended that the Defendant Booster Club not be reinstated as a school recognized booster club until the following school year, 2020-2021. He further suggested that he assist in conducting a valid and legitimate election in June 2020. Importantly, Defendant DiLollo highlighted and underlined in bold print that changes must be made to the unapproved by-laws.

93.  At the conclusion of his letter, Defendant DiLollo then asked Defendant Toback, Moffet and Weir if they wished to make any additions to what he, Defendant Rewick, and Cavins had outlined based upon their meeting. They made no changes and thus a contract between the Defendant Board and the Defendant Booster Club was finally put into place as mandated by Board Policy 9191.

94.  Although Defendant DiLollo's letter and subsequent authorized agreement with the Defendant Board gave Plaintiff a feeling of hope and a sense of optimism moving forward, however, this did not last very long.

95.  In January 2020, Defendant DiLollo informed Plaintiff that some of the unsanctioned Booster Club Officers contacted some of the Board of Education members, with whom they had associations with, both in person and in some cases via their Facebook accounts. As a result, the suspension of the Defendant Booster Club was lifted by the Defendant Board despite the Board approved agreement by 6 Board of Education members at the December 13, 2019 meeting.

96.  Defendant Kazan and the Defendant Board's mysterious decision to lift the Defendant Booster Club's suspension negated the terms and conditions agreed upon for their reinstatement and now left the Defendant Board void of any existing agreement with the Defendant Booster Club and therefore violated Board Policy 9191. In the process, Defendant Kazan and the Defendant Board took no action to ensure that the Defendant Booster Club would adhere to

Board policies, including Board Policy 9160 which prohibits alcohol at school functions which further violated Board Policy 9191. Catering to special interests for the purpose of political gain and earning friends is also a violation of Board Policy 0142 and N.J.S.A. 18A:12-24.

97. Defendant Kazan and the Defendant Board's decision to overrule the recommended revisions of the unapproved and unauthorized booster club by-laws further violated their own Board Policy 0130 as they had yet to be approved for a period that now exceeded two years. Further, their refusal to require the Defendant Booster Club to re-write its by-laws so they were consistent with all the other booster clubs at Wayne Hills made them an outlier from all the rest. The secrecy and anonymity that led to such dysfunction within the Defendant Booster Club as documented by the December 13, 2019 meeting minutes was now sanctioned by the Defendant Board, and in essence, they now condoned and endorsed the Booster Defendants to continue operating secretly and in contrast to NFHS Guidelines for Booster Clubs which mandate booster club members to listen and work closely with the head coach.

98. The new contract put into place planned to bring the Defendant Booster Club's end-of-year balance into compliance with New Jersey law ($4,500). Defendant Kazan and the Defendant Board's decision to nullify the terms and conditions of the agreement now permitted the Defendant Booster Club to remain in violation of New Jersey

27

law in spite of what Board Policy 0142 and N.J.S.A. 18A:12-24 state.

99. Defendant Kazan and the Defendant Board's decision to allow the Defendant Booster Club to continue operating without any existing agreement with the Defendant Board, or to mandate them in any way to certify adherence to all school policies placed them in violation of their own Board Policy 0142 and N.J.S.A. 18A: 12-24.1 Code of Ethics for Board Members which requires them to: Recognize that authority rests with the Board of Education and make no personal promises nor take any private action that may compromise the Board, and to surrender his/her independent judgment to special interest or partisan political groups or to use the schools for personal gain or for the gain of friends. Their permissiveness further placed them in violation of their own Policy 0142 and N.J.S.A. 18A: 12-24.1 because they did not support Plaintiff or any of the other Board of Education personnel in proper performance of their duties after they had finally consummated the contract that is required by Board Policy 9191.

100. The Defendant Board's refusal to uphold its own policies further emboldened the Booster Defendants and gave them a new sense of entitlement to not adhere to all school policies free of any consequence to which they would now take great liberties toward moving forward.

101. On January 20, 2020, unsanctioned, and self-proclaimed Booster Club President, Defendant O'Mealy, emailed Plaintiff offering assistance with pre-season purchase requests. She signed the email as Baseball Booster Club President.

102. Based on Plaintiff's knowledge and uncertainty surrounding the recent Defendant Booster Club suspension and awareness of the fact that an election was never conducted, Plaintiff referred Defendant O'Mealy to Defendant DiLollo and expressed his concern that Defendant O'Mealy was operating as if she had been duly elected as President.

103. Defendant DiLollo then informed Plaintiff that the Defendant Board directed him to organize a formal election and that he intended to do that once the season was closer.

104. Sensing a lack of support amongst the unsanctioned and unapproved booster officers while realizing few if any of their children were projected to be everyday starters on the varsity team, Plaintiff emphasized to Defendant DiLollo the creation of a liaison position for the Defendant Booster Club to reinforce to parents that a meritocracy existed within the program.

105. On March 13, 2020, the Covid-19 pandemic shut down the country and obviously the upcoming season. Up until this point, the team had just 6 practices and Defendant DiLollo had not yet completed any elections for the Defendant Booster Club. Yet, the unsanctioned

and suspended Defendant Booster Club were permitted to conduct business as if elections had taken place.

106. On May 4, 2020, the NJSIAA officially canceled the 2020 season.

107. On May 7, 2020, in the absence of an existing sanctioned Booster Club, Plaintiff was unsure who to contact but after seeking approval from Defendant DiLollo, Plaintiff emailed the baseball parents who attended the December 2019 meeting with Defendant Rewick and Defendant DiLollo to discuss senior gifts for the seven (7) graduating seniors.

108. Plaintiff was hopeful that former treasurer Dave Reicher may still have access to the Booster Club savings account and together they could arrange for senior players to receive a gift.

109. On May 9, 2020, Plaintiff exchanged cordial emails with the unsanctioned and unelected Booster Club Officers about senior gifts and a possible charity donation due to the Covid-19 pandemic.

110. Plaintiff recommended personalized Louisville Slugger wood bats which he had done previously which were well received.

111. After receiving no response from anyone over the next 21 days, Plaintiff sent an email on May 30, 2020 inquiring as to where they stood with respect to the Senior gifts.

112. In addition, Plaintiff advised of the bill Governor Murphy signed into law, A-3904/S-2337 which required all salaries and

benefits to be paid to teachers and staff. Plaintiff also indicated that he would follow up with specific dollar amounts.

113. Wayne Valley High School, which is in the same district and overseen by the same Defendant Board, has their own Baseball Booster Club, who paid their assistant baseball coaches with no issues and has properly followed Board Policy 9191.

114. With respect to the gifts for the senior class, the Defendant Booster Club completely disregarded and ignored the information provided by Plaintiff and kept Plaintiff in the dark as to what plans were being made.

115. Without advising Plaintiff, the Defendant Booster Club gave each senior player (7) a $100 gift card, a pillow, and a banner. Plaintiff was shocked and concerned because the $100 gift card is in direct violation of NJSIAA rules (Section 2 – eligibility). If the Defendant Board followed Board Policy 9191 and NFHS Guidelines by communicating and coordinating with the head coach, this violation would have been avoided. This improper conduct also jeopardized the amateur status of the student athletes.

116. Plaintiff was informed by the Booster Defendants that they had just dispersed $700 in cash payments to student athletes. In accordance to his job description (#3 C-322), which required Plaintiff to be responsible for up-to-date knowledge of conference and state rules and to follow them at all times, Plaintiff reported

this infraction to Defendant DiLollo in effort to protect the Defendant Board as well as the reputation of the baseball program.

117. Plaintiff inquired with Defendant DiLollo if the NJSIAA rules violation needed to be self-reported to the NJSIAA. Plaintiff advised that it was important to him that his program be "clean" and felt that as the face of the program, this violation should be reported to the NJSIAA to protect the school. Plaintiff believed that the NJSIAA would respect and appreciate the honesty and permit the school to handle this issue in-house. Plaintiff also felt obligated to report the infraction to protect himself from any professional liability or for disgruntled parents to exploit this information against him as being derelict in his duties.

118. Defendant DiLollo told Plaintiff he would think about it and get back to Plaintiff.

119. After secretly planning two Senior Day Events in both 2018 and 2019 without Plaintiff's knowledge, the Booster Club Officers asked Plaintiff if he was planning a drive-by celebration for the seniors for the 2020 class.

120. On May 31, 2020, Plaintiff advised the Defendant Booster Club that he was not planning any type of drive-by celebrations because based on Governor Murphy's Order, it required people to remain in their vehicles and because the guidance was unclear as to student property. Plaintiff also advised that the President of the Wayne

Education Association had advised all Wayne staff via email not to participate in them.

121. To further add to the overall situation, some of Plaintiff's assistant coaches were struggling financially and their coaching monies were needed to help them through this terrible time. But, the Booster Defendants were angry with Plaintiff based upon his adherence to the Governor's orders regarding the proposed drive-by-celebration for the senior class so they turned vindictive and in an act of retribution they refused to pay the assistant coaches' stipends in direct violation of Governor Murphy's Executive Order (A3904/S-2337) and of NFHS Guidelines for Booster Clubs. To date, this issue has never been properly adjudicated by the Defendant Board as per Policy 0133 Adjudication of Disputes.

122. In spite of two years of past precedence in which Plaintiff and his Athletic Directors approved paid stipends to assistant coaches as endorsed by the NFHS, and in spite of A3904/S-2337 implemented by Governor Murphy, the Defendant Booster Club refused Plaintiff's request that the assistant baseball coaches be paid while the Wayne Valley Booster Club made good on such payments.

123. No mention of any wishes to stop paying the coaches was ever made prior to the coaches performing their services at the start of the season in March 2020, and was only communicated to Plaintiff after the Governor passed his order mandating the payments in May 2020.

124. The Defendant Board apparently stated that one of the reasons for Plaintiff's termination was for trying and failing to get his assistant coaches paid.

125. On June 5, 2020, Plaintiff hosted an end of the season Zoom meeting and covered a wide range of topics and spoke to his student-athletes in a heartfelt and sympathetic way. A decision was made to cancel all facets of the summer program, including the camp for elementary students, their 2 summer teams, and decided not to participate in the rumored Last Dance Tournament due to the risk regarding Covid-19.

126. On June 8, 2020, one of the unsanctioned Booster Officers, Defendant Casamassina, the Vice President, emailed Plaintiff to determine if the team was directed by the school not to play in the Last Dance Tournament. It was clear that Defendant Casamassina was trying to determine if Defendant DiLollo, who had dissolved the Defendant Booster Club, was behind this decision.

127. On June 12, 2020, the NJSIAA announced that all NJSIAA coaches must limit their interactions with student athletes to virtual contact only until at least July 13, 2020 with more specific guidance on June 19, 2020.

128. On June 19, 2020, while Defendant Casamassina was contesting the decision of the cancellation of baseball and seeking to identify any high school staff member who could have directed it, the NJSIAA released their Phase 1 Guidelines. These guidelines

34

were in place at least until July 26, 2020 which was well after the start of the Last Dance Baseball Tournament. The Guidelines permitted no more than 90-minute sessions, no more than 10 student athletes being coached at a time, permitted conditioning drills only, and all participants were required to maintain social distancing.

129. Once again, Plaintiff reported a complaint to Defendant DiLollo based on the interference and meddling of Defendant Casamassina. Plaintiff felt confident that his decision to cancel all baseball related activities for the Summer of 2020 was in accordance with his job description (#3 C-322) regarding knowledge and compliancy to state rules, but he was now being subjected to toxicity and abusive treatment which was being fostered by the Defendant Board.

130. Although Plaintiff did not have the names of the people on the Defendant Board who had ties to the Booster Club Officers and who reinstated them, he indicated that based on the reinstatement, the members had become emboldened and in fact were clearly angry with Plaintiff for placing the health, welfare, and safety of all members of his program ahead of baseball and/or Senior Day events during a global pandemic. This further exacerbated the Defendant Board's violation of Board Policy 0142 and NJSA 18A:12-24.

131. On June 8, 2020, Defendant DiLollo requested spring coaches to reach out to their teams to plan a drive by event on the school campus with strict guidance and protocols.

132. Thereafter, a Zoom meeting took place with spring sports parents and Booster representatives wherein everyone agreed to certain restrictions with respect to Senior events. After conferring with the other Booster Defendants in a group chat via text Defendant Casamassina reluctantly agreed.

133. Invitations for the baseball Senior Day Event scheduled for June 23, 2020 at 6:00 p.m. went out and were posted in the team Google Classroom. Specific guidance and strict guidelines from the Athletic Department were posted in accordance with CDC guidelines, particularly the wearing of masks, social distancing, and for all supporters of student athletes remaining in vehicles etc.

134. On June 16, 2020, Plaintiff was advised by the unsanctioned Booster Club Officers at 9:47 a.m. that they will not be partaking in the Senior Day event on June 23, 2020 but would be hosting their own event that night at 6:00 p.m. wherein the assistant coaches were not invited. This was a clear demonstration of defiance toward the Plaintiff and Defendant DiLollo and in violation of NFHS Guidelines for Booster Clubs and Board Policy 9191

135. In the interests of Plaintiff's job description (#27 C-322), Plaintiff filed yet another complaint with Defendant DiLollo on

36

June 16, 2020 and proactively attempted to intervene so this event did not occur and jeopardize the school in any way.

136. Plaintiff was concerned with the safety and well-being of his players and concerned as to whether they were properly advised of proper protocols including avoiding carpools. Plaintiff then posted a notice to the team's Google Classroom and advised he would not partake in the event and reminded his players that the team's Senior Day Event was still going forward as planned on June 23, 2020 and that necessary safety measures and protocols would be followed.

137. The event scheduled by the Defendant Booster Club was a mass gathering in violation of Governor Murphy's Executive Order, which did not follow any of the required protocols, including the wearing of masks, which took place off the school campus and was held in direct violation of Board Policy 9191 as booster clubs must certify adherence to the policies of the school district.

138. In spite of violating Governor Murphy's Order, CDC guidelines, and Board Policy 9191 via published Wayne Hills Athletic Department Guidelines, the Defendant Booster Club defiantly posted a photo to their Facebook account bearing the name of the Wayne Hills baseball program that depicted students not wearing masks and not social distancing. This has since been deleted. However, this photo was posted for public display on a Facebook account associated with the Wayne Hills baseball team.

37

Board Policy 0132 (Executive Authority) required Defendant Toback

to take action in this situation, but he failed to act.

139. On June 17, 2020, Plaintiff again acting in accordance with

his job description (#27 C-322) brought his complaint to both

Defendant Rewick and Defendant DiLollo after viewing the Facebook

photo that advertised a lack of compliance in any safety measures

or guidance mandated by Governor Murphy's executive order, the CDC

and the Athletic Department guidelines. Plaintiff attached the now

deleted incriminating photo from the Defendant Booster Club

Facebook page.

140. On June 18, 2020, Defendant DiLollo wrote to Defendant Toback

with a very descriptive overview of consistent, flagrant, and

blatant misconduct on behalf of the Defendant Booster Club and

asked for his approval to send a second dissolution letter. The

letter read:

> Dr. Toback,
>
> I know you have many issues that are much more important
> and demanding of your time than the Wayne Hills Boys
> Booster Club, but I wanted to share with you the final
> draft of the dissolution of our relationship with this
> entity as I am confident that it will quickly rise to
> your attention from outside sources.
> The most important comment I can stress is that we have
> made every effort to work cooperatively with the parents
> involved in this organization and have discovered issue
> after issue with their non-compliance, lack of
> transparency, and secretive dealings and communications
> to attempt to work around instead of with me and my
> coaching staff. It is important to note that since the
> beginning of my time here at Wayne Hills we have started

38

and legitimized relations with six booster clubs that have furthered the support of our student athletes and our programs. Among those programs that already had healthy support booster clubs, I have established strong and cooperative relationships. The Baseball Booster is an absolute outlier to the general trend of strong relations.

With your support and approval, I wish to send the attached letter tomorrow, June 19, 2020, which, as you'll read, will dissolve our relationship. Unfortunately, I feel strongly that this is our only option at this point.

Please let me know if you would like to discuss further or if you have any questions or concerns.

Thank you, as always, for your continued support.

141. The letter documented the Defendant Booster Club's continued refusal to comply with NFHS Guidelines for Booster Clubs or Board Policy 9191, but more importantly cautioned Defendant Toback that he should expect that this will rise to his level.

142. With the knowledge and understanding that this would soon rise to his level just as it had during the Defendant Booster Club's first removal in 2019, Defendant Toback replied to Defendant DiLollo and granted his support and approval to send the letter and to sever the school's relationship with the booster club.

143. Since Defendant Toback both supported and approved of this measure, and consented to it in writing, both he and the Defendant Board were obligated to protect Plaintiff in proper performance of his duties as Board Policy 0142 requires, as well as to enforce the adherence to all school policies mandated by Board Policy 9191

once the anticipated complaints from the Booster Defendants rose to his level as accurately predicted by Defendant DiLollo.

144. After receiving written approval from Defendant Toback, Defendant DiLollo sent the second dissolution letter to the members of the Defendant Booster Club dated June 18, 2020. The letter mandated that the club now remove the name of their school from their entity.

145. The letter confirms the Booster Defendants were not working with Plaintiff as per NFHS and Board Policy 9191. The letter closes by, "[w]e will be looking to assist in the formation of a legally compliant communicative booster club in the days ahead."

146. Immediately after sending the second dissolution letter, Defendant DiLollo sent a text to the high school administration and Central Office staff. The text read, "Colleagues, Just moments ago I sent a letter dissolving WHHS relationship with the acting baseball booster club. I am confident in two things. 1- This was the right and necessary thing to do, and 2- a likely proverbial shitstorm is about to be unleashed. I am just giving you the heads up as I am confident it is likely your constituents and connections ask you about."

147. Defendant DiLollo made it clear that the Booster Defendants would, once again, go running to their friends on the Defendant Board to complain.

148. Defendant DiLollo's text served as not one, but now a second warning to Defendant Toback that there would be backlash coming from the Booster Defendants whom he knew from their first removal had personal ties and connections to members of the Defendant Board. Defendant DiLollo's choice of the word "shitstorm" indicated that the anticipated backlash would be a volatile situation, which ultimately equated to both false light and defamation being directed at Plaintiff.

149. Once Defendant Toback approved the measure for the school to disassociate with the Defendant Booster Club for a second time, Board Policy 0142 and 9191 required him as well as the Defendant Board to protect Plaintiff in proper performance of his duties (C-322) and to plant their feet firm once the backlash ensued.

150. Defendant DiLollo informed Plaintiff that they could not prevent the Defendant Booster Club from having their own club, but based upon their repeated lack of compliance to Policy 9191 and NFHS Guidelines, Defendant DiLollo would now work together with Plaintiff to form their own booster club under the name of the school that was willing to comply with all state rules and Board of Education policies.

151. After the official baseball Senior Day event on June 23, 2020, spring sports at the high school concluded. For the third straight year, Plaintiff did not receive a formal evaluation. In fact, to date, Plaintiff has never received a written evaluation from the

41

Wayne Hills administration, nor did he ever receive any negative comment from any Central Office administrator, Board of Education member, or direct supervisor.

152. Soon after this conversation, Defendant DiLollo advised Plaintiff that the exiled former Booster Club Officers were attempting to overturn the second dissolution by the school.

153. Defendant Toback was well aware of the violations committed by the Defendant Booster Club, including the failure to adhere to Board policies. The Defendant Board was also in violation of its policy 0131 (Bylaws and Policies).

154. Instead of taking action, Defendant Toback, in October 2020, mandated that Defendant DiLollo attend a Zoom meeting with Defendant Toback and the Booster Defendants. Defendant DiLollo told Plaintiff that he advised Defendant Toback that this was not a good idea.

155. After the Zoom meeting took place, Defendant DiLollo telephoned Plaintiff and advised of the following:

- Defendant Toback, who signed off on and approved Defendant DiLollo's dissolution letter of the Defendant Booster Club for the second time in June 2020, apologized to the Booster Club Officers on Defendant's DiLollo's behalf.

- Defendant O'Mealy demanded that Defendant DiLollo publicly apologize and claimed that Defendant DiLollo damaged her reputation.

- Defendant Casamassina asked Defendant Toback and Defendant DiLollo who would control the coach if there is no booster club.

- The Defendant Booster Club was going to be reinstated for a second time despite the fact that the School Defendants were aware that the Booster Defendants had knowingly and intentionally violated Board policies, multiple executive orders passed by Governor Murphy and NJSIAA rules with respect to cash payments made to student athletes.

- The twice dissolved Booster Club Officers were assigned to run a new election and were eligible to run again as officers and that Defendant Rewick would assist in that process and Defendant DiLollo was not permitted to be involved in it.

156. Defendant Toback clearly violated multiple Defendant Board Policies including 0120 (Authority and Powers), Policy 0133 (Adjudication of Dispute), Policy 0131 (Bylaws and Policies), Policy 0132 (Executive Authority). Policy 0132 specifically states the Defendant Board is required to exercise its executive power in part by the appointment of a Superintendent as Chief School Administrator, who shall enforce the statutes of the state of New Jersey, rules and policies of the Defendant Board.

157. Defendant Toback was well aware of the Booster Defendants' violations of Governor Murphy's executive order and Defendant Board policy 9191 but did nothing.

158. Through his actions, Defendant Toback also violated Policy 0142 (Code of Ethics) which is in accordance with New Jersey

statute, N.J.S.A. 18A:12-24.1, which states that the Superintendent identifies needs and policies, develops regulations, provides leadership and manages the day-to-day operations of the school. Defendant Toback was clearly in dereliction of his duties.

159. Defendant DiLollo stated that he was particularly concerned about Defendant Casamassina's comment about the Booster Club's intent to control Plaintiff.

160. Defendant DiLollo further stated that the Booster Club Officers were being reinstated for the second time because of their connections to certain Defendant Board members.

161. When Plaintiff questioned Defendant DiLollo as to why Defendant Toback completely reversed his position as to the violations committed by the Defendant Booster Club, Defendant DiLollo specifically stated that Defendant Toback's contract was coming up for renewal and he wanted a new contract. Defendant DiLollo stated that Defendant Toback asked him, "Is this the hill you want to die on?"

162. This conduct was a clear violation by Defendant Toback of N.J.S.A. 18A:12-24 (Conflicts of Interest), which holds, in pertinent part, that no school official shall use his official position to secure unwarranted privileges, advantages, or employment for himself or members of his immediate family.

163. After Plaintiff called his assistant coaches, he became aware that Defendant Kazan, the Board President, was friends with some of the Booster Club Officers, including Defendants O'Mealy, Casamassina and D'Agati.

164. In November 2020, based on the shocking reversal by Defendant Toback, Plaintiff reiterated his prior written complaints from the past two years and requested that the Defendant Board's Administration to ensure that Defendant Board policies were adhered, including the prohibition of the sale and consumption of alcohol during team banquets (Policy 9160) and ensuring the Defendant Booster Club by-laws were revised to be in compliance with school policy (Policy 9191).

165. Plaintiff also requested that Defendants Toback and DiLollo to create a liaison from the Defendant Booster Club to the baseball program and to ensure that assistant coaches were paid for past seasons as per Governor Murphy's executive order.

166. In his written complaint, Plaintiff also asked that the school administration or the Defendant Board clear his name in writing for not having any involvement in the purchase of the $100 gift cards given to the student athletes in June 2020, which totaled $700 and the violations of Governor Murphy's Orders as was required by Board Policy 0133 (Adjudication of Disputes).

167. After not hearing anything from Defendant DiLollo, Plaintiff called him to find out what the status was of his complaints.

45

Defendant DiLollo then contacted Defendant Rewick, who advised Defendant DiLollo to stand down on Plaintiff's complaints or Defendant DiLollo's job would be in jeopardy. More importantly, Defendant Rewick told Defendant DiLollo "Scott Illiano may be too good for Wayne Hills and maybe these parents have to learn that lesson the hard way."

168. Upon learning of Defendant Rewick's warning, Plaintiff became concerned that the Defendant Board and its administrators had completely changed their position as to the improprieties of the Booster Defendants.

169. There could be no disputing the fact that the Booster Defendants were conspiring with Defendant Kazan and others. It was also clear that Defendant Kazan was dictating the terms of the Booster Club Officers' fate to Defendant Toback.

170. On December 1, 2020, baseball parent, Dan Gilligan, advised Plaintiff that although he was seeking the position of President of the Defendant Booster Club, the Defendant Booster Club refused to put his name on the ballot. In fact, Defendant O'Mealy was listed on the ballot as running unopposed as were all of the officers. In addition, new rules were being made up that prevented all 9th and 10th grade baseball parents from running for an officer position.

171. As required in his Performance Responsibilities (#27 C-322), Plaintiff called Defendant DiLollo on December 2, 2020 and told

him what was happening and that he was not even aware that the election was taking place as was required by NFHS Guidelines. Defendant Rewick, who was supposed to be overseeing the election, did not advise Plaintiff.

172. On the same date, December 2, 2020, Mr. Gilligan emailed Plaintiff a copy of his nomination form to the Defendant Booster Club email address. This email to the boosters requested clarity as to why he was left off the ballot and information as to who was running the election. Mr. Gilligan was told that he did not fit the criteria because he was not a paid member in 2019. This was completely contradictory to the by-laws, which was not approved by the Defendant Board.

173. On December 4, 2020, Mr. Gilligan, a parent of 2 sophomore boys involved in the baseball program and taxpayer in the community emailed Defendants Toback, Rewick, and DiLollo and asked them to fairly and properly adjudicate the fact that he was being disenfranchised and prohibited by the Booster Defendants from running for an Officer Position against their own by-laws in an election supposedly being overseen by Defendant Rewick. All School Defendants had an obligation to properly adjudicate this dispute as per Board Policy 0133. The facts show they refused to do so.

174. The by-law that was being intentionally manipulated was originally created to require elected officers to continue to pay their membership dues. Yet, the Booster Defendants were

manipulating it to claim the by-law required prior paid membership in order to be eligible to run for an officer position. Defendant Rewick knew this was wrong and sent an email to the Booster Defendants questioning this practice.

175. Because the Booster Defendants were misusing their by-laws again, Defendant DiLollo advised the Booster Defendants to hold off on announcing any "election" results and scheduled a Zoom call that would take place with him and Defendant Rewick on December 7, 2020.

176. On December 4, 2020, Plaintiff acting in accordance with his performance responsibilities (C-322) was professionally obligated to call on his superiors to properly adjudicate this dispute as per Board Policy 0133. He followed the chain of command in a letter that he sent to Defendants Rewick and DiLollo that also included Defendant Toback who was already made aware of the Booster Defendants conduct toward Mr. Gilligan. Plaintiff requested for the school employees including Defendant Toback to properly adjudicate this dispute in a manner that would be both consistent with the booster club by-laws and Board Policy 9191.

177. In the days that followed, Defendant Kazan, the Defendant Board and Defendant Toback retaliated against Plaintiff for requesting that his superiors resolve the election fraud being committed by the Booster Defendants.

48

178. This was a massive problem in Plaintiff's program as not only was Mr. Gilligan being disenfranchised while being prevented from running for office but so were all other 9th and 10th grade baseball parents. This was too big a problem for him to ignore. He had no choice but to report it, and falsely assumed that the School Defendants would rectify the election improprieties since it pertained to a school-sponsored program.

179. On the morning of December 7, 2020, Plaintiff exchanged text messages with Defendant DiLollo to see if the Booster Defendants confirmed their availability for the scheduled meeting. DiLollo sarcastically texted, "It's better than that."

180. Defendant DiLollo then called Plaintiff and asked Plaintiff about a book he published over 9 years ago and indicated that Defendant Toback wanted a copy. More alarming, Defendant DiLollo stated that Defendant Toback intended on speaking with the Defendant Board about his book.

181. Defendant DiLollo then informed Plaintiff of disparaging comments made by Defendants O'Mealy, Casamassina and D'Agati about Plaintiff.

182. Specifically, within 48 hours of an actual election for booster club officers, DiLollo advised Plaintiff that Defendants O'Mealy, Casamassina and D'Agati personally delivered a copy of Plaintiff's book to members of the Defendant Board, including Defendant Kazan.

183. Based on this, Defendant Toback demanded Defendant DiLollo find out what Plaintiff stated in his book about "booster clubs" because Defendants O'Mealy, Casamassina and D'Agati made allegations that Plaintiff had a personal agenda as to the Defendant Booster Club based upon their own inaccurate interpretations of Plaintiff's book.

184. Defendants O'Mealy, Casamassina and D'Agati intentionally misrepresented the contents of Plaintiff's book to his employer in a desperate attempt to divert attention away from the election fraud they had been committing in an effort to spare themselves from having the booster club being dissolved for a third time or at a minimum, an attempt to prevent them from being removed from the Defendant Booster Club and/or not being permitted to hold an officer position.

185. The result of the false allegations against Plaintiff was Defendant Toback now planned to schedule a meeting with the full Defendant Board to discuss Plaintiff's employment. Defendant Kazan and Defendant Toback also prohibited both Defendant Rewick and Defendant DiLollo from moving forward with their meeting with the Booster Defendants in an effort to properly adjudicate the election fraud as originally scheduled.

186. The Zoom meeting to rectify the election fraud committed by the Booster Defendants was canceled and the focus became Plaintiff and his book. This meeting was never re scheduled nor was it ever

made up as the School Defendants consciously allowed the Booster Defendants to disenfranchise Mr. Gilligan as well as all other 9th and 10th grade baseball parents in spite of Plaintiff's written request for them to properly adjudicate the matter as was required by Board Policy 0133 (Adjudication of Disputes).

187. The Booster Defendants in conjunction with Defendant Kazan and now Defendant Toback were utilizing Plaintiff's book from 9 years prior to malign Plaintiff in order to get him terminated.

188. Plaintiff's book was published in 2011 which pertained to his journey in becoming a head coach in baseball at the age of 23, which included issues that he had to overcome that occurred more than 20 years ago at another school.

189. Although the Defendant Board was aware of Plaintiff's book for at least 3 years as it was listed on his resume and discussed during his interview, it was now utilizing it to try and manufacture a reason to terminate Plaintiff.

190. At 12:10 p.m. on December 7, 2020, Plaintiff texted a friend, Pat Hardin, that Defendant DiLollo admitted that Defendants O'Mealy, Casamassina, and D'Agati brought Plaintiff's book to members of the Defendant Board over the past weekend which resulted in Plaintiff becoming the target of possible termination. This was just prior to the meeting wherein Defendants Rewick and DiLollo were going to put a stop to the fraudulent election for the Defendant Booster Club.

191. Realizing the School Defendants had no logical or rational reason to overlook the rampant election fraud by the Booster Defendants, and to now "investigate" Plaintiff based on false representations by Defendants O'Mealy, Cassamasina, and D'Agati, Plaintiff sent a text message to Defendant DiLollo on December 7, 2020 at 12:22 p.m. and stated, "It's urgent that we speak as I'm considering an ethics complaint against the Board President (Defendant Kazan) to the State Department of Education. I'm also considering self-report to NJSIAA for boosters paying cash to students."

192. A few hours later, Defendant DiLollo texted Plaintiff at 3:38 p.m. requesting Plaintiff to call him. During this call, Defendant DiLollo told Plaintiff that he would be receiving a Rice notice regarding his baseball position. This was directly related to Defendants O'Mealy, Cassamasina, and D'Agati making false claims about Plaintiff based on Plaintiff's book.

193. The School Defendants no longer pursued rectifying the fraudulent elections and by-laws of the school-sponsored booster club. In failing to do so, they violated Board Policy 0133. This issue affected not only the Plaintiff but all parents of baseball players and the tax payers of the district.

194. The Booster Defendants succeeded in rigging their election as they ran the election themselves, and all of them won a seat running unopposed because they would not permit Mr. Gilligan or

52

any other 9th or 10th grade baseball parent to run which was supported by the School Defendants.

195. In failing to adjudicate the election fraud, the School Defendants violated Board Policy 0142 and N.J.S.A. 18A:12-24.1 as they failed to support Plaintiff in proper performance of his duties (C-322).

196. If the School Defendants had any questions or concerns about the contents of Plaintiff's book, or any of the events that he wrote about, some of which had occurred 21 years prior, they could have, and should have, still rectified the election fraud issues.

197. Defendant Toback never followed up with Mr. Gilligan in any way despite his written complaint of the Booster Defendants misusing by-laws.

198. Defendant Rewick was assigned by Defendant Kazan and Defendant Toback to run the booster club election. No one contacted Mr. Gilligan despite previously advising Mr. Gilligan the election had been put on hold.

199. Based on this, Mr. Gilligan felt betrayed and was incensed at the corruption of all of the Defendants.

200. On December 10, 2020, Defendant Rewick called Plaintiff to discuss the situation.

201. Defendant Rewick advised Plaintiff that the Booster Defendants accused Plaintiff of improperly attempting to influence

the booster club election in order to get Mr. Gilligan elected for the sole purpose of ensuring his assistant coaches got paid.

202. Plaintiff adamantly denied this claim and stated that the election for a booster club that is supposed to be working in conjunction with him was being done without his knowledge and based on made up by-laws. Since Plaintiff had a professional obligation relative to his job description (C-322) to report this infraction to his superiors and ask them for their help, his obligation rendered the Booster Defendants' faulty claim to be another attempt to disparage Plaintiff.

203. It is also clear that if Plaintiff had not reported this conduct, no Rice letter would have been issued.

204. Defendant Rewick then asked Plaintiff if he had asked the Defendant Booster Club to pay the assistant coaches as if Plaintiff had done something wrong or outside of the NFHS Guidelines. He then requested documentation regarding Plaintiff's request for his coaches to be paid, which Plaintiff readily provided in two emails dated December 10, 2020.

205. The payments to the assistant coaches based on 2 years of past precedent, Governor Murphy's Executive Orders and NFHS Guidelines. Furthermore, NFHS Guidelines prohibit booster club members from ransoming or utilizing funds for the purpose of controlling the hiring and firing of a coach which is exactly what the Booster Defendants were trying to do evidenced by Defendant

54

Rewick demanding Plaintiff's written requests that his assistant coaches be paid.

206. More alarming, Defendant Rewick then advised Plaintiff that at the time Defendants O'Mealy, Casamassina and D'Agati brought Plaintiff's book to Defendant Kazan and other members of the Defendant Board, they made the false contention that Plaintiff wanted players to do winter training at Mr. Gilligan's facility because Plaintiff was receiving monetary kickbacks from Mr. Gilligan.

207. This was a knowingly false statement to place Plaintiff in a false light with his employer. In addition, this was done to create some type of justification to have Plaintiff terminated. It was communicated to Plaintiff by Defendant Rewick, the Principal and one of the highest ranking officials in the school, who advised that this information came directly from Defendants O'Mealy, Casamassina and D'Agati during closed door discussions with Defendant Kazan.

208. The allegation was true enough for Defendant Rewick to demand that Plaintiff provide him with any documentation or proof to disprove Defendants O'Mealy, Casamassina and D'Agati claims that Mr. Gilligan was providing monetary kickbacks to him.

209. Plaintiff was also advised by Defendant Rewick as an employee of the Defendant Board that this false claim was, in fact, made by

Defendants O'Mealy, Casamassina and D'Agati when he was waiting for his Rice notice.

210. At 8:01 p.m. on December 10, 2020, Plaintiff forwarded an email to Defendant Rewick discrediting the false claims made by Defendants O'Mealy, Casamassina and D'Agati. The email was from November 27, 2019 specifically noting that the winter program was "voluntary."

211. On December 10, 2020 at 8:17 p.m., Plaintiff sent a text message to Defendant DiLollo expressing his shock as to what Defendant Rewick confronted him with and that the false claims by Defendants O'Mealy, Casamassina and D'Agati were shared with him and members of the Defendant Board. Defendant DiLollo, who had heard these false claims, described the situation as "crazy."

212. The next day, Plaintiff exchanged text messages with Dan Gilligan that are time stamped informing him of the kickback allegation Defendant Rewick had shared and called it the most highly offensive accusation made about him as a professional.

213. Plaintiff is also in possession of an email sent to the Wayne Administration in May of 2021 by baseball parent Scott Appel in which he referenced Plaintiff by stating "The past coach did what he did, unethical and all." This shows that the defamatory statements by Defendants Casamassina, O'Mealy, and D'Agati had been published to third parties.

56

214. It was now clear that Defendant Rewick and Defendant DiLollo had changed their tone and flipped their position on the entire situation, making Plaintiff the scapegoat. The perpetual defamation and slander that Defendants Casamassina, O'Mealy, and D'Agati had shared with board members between December 4 and December 10, 2020 negated the fact that Ms. Weir had vowed along with Central Office staff not to let parents fire another coach by violating Board Policy 0120.

215. Defendant Rewick then began a course of conduct of trying to somehow substantiate the allegation by the Booster Defendants.

216. Plaintiff complained to Defendant Rewick that he could not believe that Defendant Rewick was now siding with the Booster Defendants, who he knew violated laws and school policies.

217. Defendant Rewick was being directed by the Defendant Board and Defendant Toback to go after Plaintiff to appease the Booster Defendants. Oddly, after Plaintiff stated his disbelief, Defendant Rewick stated that Plaintiff was a good guy and called the Defendants O'Mealy, Casamassina and D'Agati "scumbags." Defendant Rewick also stated that this was being orchestrated at a level above him and then stated a familiar phrase "there are hills that you die on."

218. In short, Defendant Toback, who wanted a new contract, made the decision to cater to Defendants O'Mealy, Casamassina and D'Agati to have Plaintiff removed as coach. This is a clear

57

violation of Board Policies # 0120, #0142, and N.J.S.A. 18A: 12-24.

219. After this conversation, and based on the RICE notice, as well as the fact that Plaintiff was now made aware of how he was being maligned by Defendants O'Mealy, Casamassina and D'Agati sent a text message to Defendant DiLollo to advise him that he wanted his employment discussed in open session and that he had hired an attorney.

220. On December 11, 2020, Defendant DiLollo called Plaintiff and advised him that he had been given a directive to no longer communicate with Plaintiff going forward. Defendant DiLollo then apologized to Plaintiff for being put through this ordeal.

221. Plaintiff was stunned and could not believe his immediate supervisor was no longer permitted to talk to him prior to his position even being discussed by the Defendant Board.

222. On December 15, 2020, Plaintiff received his Rice notice for the Board of Education meeting on December 17, 2020. This meeting was postponed due to weather and rescheduled for December 21, 2020.

223. At the Board of Education meeting on December 21, 2021, no action was taken and no information was provided to Plaintiff.

224. On January 14, 2021, Plaintiff still had received no information or update regarding the closed session meeting during the December 21, 2021 Board of Education meeting. However, 59

Spring coaches between Wayne Hills and Wayne Valley had been approved, excluding Plaintiff.

225. On January 15, 2021, despite approving 59 coaches, Defendant DiLollo sent an email which advertised all Spring coaching positions.

226. Despite the clear indication that the School Defendants were retaliating against Plaintiff for his various complaints about the unlawful and inappropriate conduct that was taking place, Plaintiff submitted an application via Applitrack even though he was never issued another Rice notice and even though no action had been taken as to his position. This was the first time Plaintiff re-applied for the head baseball coaching position that he had held since November 2017.

227. No subsequent Rice notice was ever received and Plaintiff was completely in the dark.

228. Plaintiff began being contacted by upset parents, alumni, assistant coaches, and football staff believing that he was terminated.

229. At this time, Plaintiff had a gag order with his direct supervisor, Defendant DiLollo, even though he had already been informed that no action was taken as a result of the closed hearing from his Rice notice, and was provided no information as to his coaching position.

230. Plaintiff emailed Defendant DiLollo, Defendant Rewick and Defendant Toback to find out what was happening.

231. Approximately two hours after his email, Defendant DiLollo called Plaintiff and confided in Plaintiff that he was not sure he was even supposed to talk to him but engaged in a lengthy conversation about the situation.

232. During this call, Plaintiff reiterated all of the prior issues and the fact that Plaintiff was never provided his due process with respect to his coaching position. Defendant DiLollo stated that no decision was made as to Plaintiff's coaching position. He revealed that Plaintiff's book had been quoted in board meetings. He used the plural form of the word meetings. He then stated that he had read it and Defendant Toback also read it.

233. Defendant DiLollo also confirmed that the Defendant Board upheld the Defendant Booster Club election results despite the fact that it had violated its own by-laws and Board Policy 9191, and despite the fact that Defendants DiLollo and Rewick both suspended the prior election results based upon this very issue.

234. Defendant DiLollo then informed Plaintiff that if Plaintiff does not get terminated, the assistant coaches will not get paid their stipends but this could change after the Booster Defendants' sons graduate in June 2021.

235. This statement confirmed that the Defendant Board was violating NFHS Guidelines and Board Policy 9191 by permitting the

Defendant Booster Club to operate in a self-serving manner to control the program and coach. In addition, it was still in violation of Governor Murphy's Executive Orders.

236. Then, with no explanation, opportunity to be heard or any other information, Plaintiff was terminated as the head coach of the baseball team on January 19, 2021 via email.

237. The termination email was sent by Defendant Rewick who emailed Plaintiff on June 17, 2020 stating the following:

> Scott, Jeff just shared with me your letter. It continues to be disappointing how you are being treated by the club. Jeff has crafted a letter, with my approval, that will soon get the Super's blessing to resolve long overdue issues with baseball parents. I want to let you know of my admiration for your integrity, straightforwardness, and passion for your sport. Please continue to be the quality person and coach you are and Jeff and I will be solving these issues. Take a deep breath, enjoy your friends and family and lets' move forward. Be well.

238. Shortly after Defendant Rewick sent a follow up email to Plaintiff stating, "Simply put, they showed themselves as they truly are: selfish."

239. In between Defendant Rewick's letter apologizing to Plaintiff for the parent misconduct he was subjected to in June 2020 and his termination letter sent to Plaintiff in January 2021, Plaintiff coached zero practices and zero games. He did however continue following his job description (#27 C-322).

240. There can be no other logical conclusion that Plaintiff was terminated based on the actions of the Booster Defendants and

because of his complaints to the School Defendants of the various violations of school policies.

241. Board Policy 0142 and N.J.S.A. 18A:12-24 requires Board members to support personnel in proper performance of their duties and prohibits them from catering to special interests.

242. Due to the corruption and the termination of Plaintiff, Mr. Gilligan removed his sons from the school and transferred them to Passaic County Tech in January 2021. Both boys accepted scholarships to play Division I baseball at St. Peters University in September 2022.

**COUNT ONE**

**(Section 1983 Civil Rights Claim – Procedural Due Process)**

243. Plaintiff repeats and realleges all the foregoing allegations and facts as if set forth herein.

244. Defendant Board is a public entity and at all relevant times, the employer of the Plaintiff.

245. Defendant Kazan is the President of the Defendant Board.

246. Defendants O'Mealy, Casamassina and D'Agati made defamatory and false statements about Plaintiff which were unexplained and placed Plaintiff in a false light.

247. These statements included allegations of malice and animus toward all booster clubs based on Plaintiff's book including incidents that occurred over 20 years ago and that Plaintiff was

receiving illegal monetary kickbacks for a winter program being run by a parent in the program.

248. Defendants Rewick, DiLollo and Toback were also aware of legitimate complaints by Plaintiff about the conduct of the Booster Defendants with respect to the Defendant Booster Club but failed to take action. In addition, these Defendants were well aware that the Booster Defendants' allegations against Plaintiff were knowingly false but did nothing to prevent these defamatory statements from being considered by the Defendant Board.

249. These false statements and allegations were specifically done to ensure Plaintiff was terminated as the head baseball coach for the high school.

250. Defendants created and disseminated a false and defamatory impression as to Plaintiff in connection with his termination, thereby depriving Plaintiff of his protected liberty interest in his reputation.

251. Plaintiff, as the head baseball coach for the Defendant Board, had an interest in his reputation being protectable from defamation by disgruntled parents.

252. Plaintiff's good name, reputation, honor and/or integrity was at stake based on the conduct of the all of the Defendants.

253. As such, the Defendant Board was obligated to provide Plaintiff notice and an opportunity to be heard to clear his name.

63

254. The Defendant Board failed to provide Plaintiff with any notice or an opportunity to be heard to clear his name.

255. Plaintiff's termination based on the above facts satisfies the stigma-plus test wherein a public employee has a liberty interest in his reputation.

256. In doing so, the Defendant Board violated and deprived Plaintiff of his procedural due process rights as per Section 1983.

257. As a direct and proximate result of the School Defendants' conduct, Plaintiff was injured and will continue to suffer damages.

**WHEREFORE**, Plaintiff demands judgment against the School Defendants for compensatory damages, consequential damages, punitive damages, attorney fees, interest, costs and such other relief as the Court deems just and equitable.

### COUNT TWO

### CEPA Violation and Retaliation
### (Conscientious Employee Protection Act ("CEPA")

258. Plaintiff repeats and realleges all the foregoing allegations and facts as if set forth herein.

259. Defendant Board is an employer under N.J.S.A. 39:19-2(a) as it is a "branch of state government, or the several counties and municipalities thereof, or any other political subdivision of the state, or a school district, or any special district, or any authority, commission, or board or any other agency or instrumentality thereof." N.J.S.A. 34:19-2(a).

260. Defendant Toback is considered an employer and/or subject to liability under N.J.S.A. 34:19-2(a) as he is "[an] individual . . . or person . . . acting directly or indirectly on behalf of or in the interest of any employer with the employer's consent . . ." N.J.S.A. 34:19-2(a).

261. Defendant Rewick is considered an employer and/or subject to liability under N.J.S.A. 34:19-2(a) as he is "[an] individual . . . or person . . . acting directly or indirectly on behalf of or in the interest of any employer with the employer's consent . . ." N.J.S.A. 34:19-2(a).

262. Defendant DiLollo is considered an employer and/or subject to liability under N.J.S.A. 34:19-2(a) as he is "[an] individual . . . or person . . . acting directly or indirectly on behalf of or in the interest of any employer with the employer's consent . . ." N.J.S.A. 34:19-2(a).

263. Under N.J.S.A. 34:19-3, "an employer shall not take any retaliatory conduct against an employee because the employee does any of the following . . . discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer . . . that the employee reasonably believes: (c)(1) is in violation of a law, or a rule or regulation promulgated pursuant to law . . . [and/or] (c)(3) is incompatible with a clear mandate of public policy concerning the public health, safety or

65

welfare or protection of the environment." N.J.S.A. 34:19(c)(1) and (3); N.J.S.A. 34:12.

264. Plaintiff made several good faith complaints and engaged in protected activity when he complained about the Booster Defendants complete failure to adhere to Governor Murphy's Executive Orders, NJSIAA regulations and Defendant Board policies, which Plaintiff reasonably believed to be in violation of law, statute, policies, ethics rules, regulation and/or a clear mandate of policy regarding public welfare.

265. These violations pertain to the misuse of Board policies that affect the student athletes at Wayne Hills High School.

266. Defendant Board Policy 9191 specifically addresses booster clubs at the school. Any booster club that is recognized by the Defendant Board must follow this policy.

267. Policy 9191 specifically states, "[b]ecause the activities of booster clubs also reflect on the district, the Board establishes guidelines for the operation of booster clubs in order to ensure their activities assist in the attainment of district goals and objectives.

268. Despite the Defendant Board dissolving the Defendant Booster Club on two separate occasions, the Defendant Board changed its position in December 2019 after receiving false claims from Booster Defendants of monetary kickbacks received by Plaintiff from a

parent. In doing so, it recognized the Defendant Booster Club as a valid booster club pursuant to Policy 9191.

269. In addition, the School Defendants terminated Plaintiff based on these false claims and also because Plaintiff complained that the School Defendants were not following Board policies that affect the student athletes and taxpayers' monies.

270. The Defendant Board's insurance policy is providing a defense to the Booster Defendants confirming that the Booster Defendants are agents of the Defendant Board as they are receiving the benefits of an insurance policy that is funded by taxpayers' monies. This further supports the complicity and acceptance by the School Defendants of the illegal and wrongful conduct of the Booster Defendants.

271. The School Defendants ignored the fraudulent activities of illegal elections and misuse of monies intended for the student athletes and instead, terminated Plaintiff for making complaints after Plaintiff reasonably believed the violations of the above regulations, laws, policies and guidelines violated clear mandates of public policy.

272. Plaintiff made the above complaints to his supervisors, Defendants DiLollo, Rewick and Toback, who in turn recommended his termination which was then affirmed by the Defendant Board.

273. The temporal proximity between the above events and Plaintiff's termination clearly demonstrate that his termination was retaliatory.

274. As a direct and proximate result of the actions alleged herein, Plaintiff has suffered and will continue to suffer loss of wages, loss of amenities of employment, out of pocket expenses, emotional damages, loss of reputation, the loss of opportunities for prospective employment, other similar damages, all to Plaintiff's great detriment.

275. The School Defendants' actions were willful and wanton and thus require the imposition of punitive damages.

276. Plaintiff seeks payment of costs and reasonable attorneys' fees and costs.

**WHEREFORE,** Plaintiff demand judgment against the School Defendants for compensatory damages, consequential damages, punitive damages, attorney fees with enhancement under Rendine v. Pantzer, interest, costs and such other relief as the Court deems just and equitable.

## COUNT THREE

### (Pierce Claim – Violation of Public Policy)

277. Plaintiff repeats and realleges all the foregoing allegations and facts as if set forth herein.

278. By and through the conduct described above, Plaintiff was terminated from his coaching position at Wayne Hills High School

due to his refusal to act in concert and condone the unlawful activities of the Booster Defendants and for complaints against the School Defendants for failing to adjudicate the election fraud in violation of Board Policy 0142 and N.J.S.A. 18A:12-24.1.

279.    Plaintiff was subjected to the conduct described herein, based in part, because he refused to submit to the pressure placed on him to condone the unlawful conduct of the Booster Defendants which includes violation of Governor Murphy's Executive Orders.

280. Because of the several complaints filed by Plaintiff, the Booster Defendants became angry and started colluding with Defendant Kazan to have Plaintiff terminated.

281. It is against the public policy of the State of New Jersey for a staff member to be terminated for raising unlawful conduct by a booster club who is supposed to be a pathway to help the Defendant Board's sports teams.

282. In addition, it is against the public policy of the State of New Jersey for school districts that are funded by taxpayers' monies to permit booster clubs, especially The School Defendants no longer pursued rectifying the fraudulent elections and by-laws of the school-sponsored booster club. In failing to do so, they violated Board Policy 0133. This issue affected not only the Plaintiff but all parents of baseball players and the tax payers of the district.

283. Defendant Board Policy 9191 specifically addresses booster clubs at the school. Any booster club that is recognized by the Defendant Board must follow this policy.

284. Policy 9191 specifically states, "[b]ecause the activities of booster clubs also reflect on the district, the Board establishes guidelines for the operation of booster clubs in order to ensure their activities assist in the attainment of district goals and objectives.

285.  Despite the Defendant Board dissolving the Defendant Booster Club on two separate occasions, the Defendant Board changed its position in December 2019 after receiving false claims from Booster Defendants of monetary kickbacks received by Plaintiff from a parent. In doing so, it recognized the Defendant Booster Club as a valid booster club pursuant to Policy 9191.

286. In addition, the School Defendants terminated Plaintiff based on these false claims and also because Plaintiff complained that the School Defendants were not following Board policies that affect the student athletes and taxpayers' monies.

287. The Defendant Board's insurance policy is providing a defense to the Booster Defendants confirming that the Booster Defendants are agents of the Defendant Board as they are receiving the benefits of an insurance policy that is funded by taxpayers' monies. This further supports the complicity and acceptance by the

School Defendants of the illegal and wrongful conduct of the Booster Defendants.

288. The School Defendants ignored the fraudulent activities of illegal elections and misuse of monies intended for the student athletes and instead, terminated Plaintiff for making complaints after Plaintiff reasonably believed the violations of the above regulations, laws, policies and guidelines violated clear mandates of public policy.

289. Plaintiff made the above complaints to his supervisors, Defendants DiLollo, Rewick and Toback, who in turn recommended his termination which was then affirmed by the Defendant Board.

290. The temporal proximity between the above events and Plaintiff's termination clearly demonstrate that his termination was retaliatory.

291. If the School Defendants had any questions or concerns about the contents of Plaintiff's book, or any of the events that he wrote about, some of which had occurred 21 years prior, they could have, and should have, still rectified the election fraud issues.

292. Defendant Toback never followed up with Mr. Gilligan in any way despite his complaint of the Booster Defendants misusing by-laws.

293. The negligent, reckless and/or intentional conduct of Defendant Board and Defendants Kazan, Rewick, DiLollo and Toback clearly violates the public policy of the State of New Jersey.

71

294.  Plaintiff's termination was in retaliation for Plaintiff's complaints and refusal to permit unlawful conduct to go unchecked.

295.  As a direct and proximate result of the actions alleged herein, Plaintiff has suffered and will continue to suffer both economic and non-economic damages, including but not limited to pain and suffering, mental anguish, emotional distress, physical manifestations of injury, loss of employment opportunities and compensation, loss of reputation, and other such damages compensable under this Pierce Claim.

**WHEREFORE,** Plaintiff demand judgment against Defendant Board for compensatory damages, consequential damages, punitive damages, attorney fees with enhancement under Rendine v. Pantzer, interest, costs and such other relief as the Court deems just and equitable.

### COUNT FOUR

**(Violation of Plaintiff's Rights under the New Jersey State Constitution in Violation of the New Jersey Civil Rights Act, under Article I, Paragraph 1 of the New Jersey State Constitution - N.J.S.A. 10:6-1 et. seq.)**

296. Plaintiff repeats and realleges all the foregoing allegations and facts as if set forth herein.

297. The actions of Defendant Board and Defendants DiLollo, Rewick and Toback, as enumerated above, were taken in retaliation for Plaintiff's exercise of his First Amendment rights, including his right to freedom of speech and his right to petition for the redress of grievances, including but not limited to Plaintiff's

complaints against the School Defendants and Booster Defendants as outlined in the above paragraphs and Plaintiff's requests as to the status of his Rice notice. As a result, the adverse employment actions levied against Plaintiff violated the New Jersey State Constitution.

298. Plaintiff's termination was done via letter dated January 19, 2021 from Defendant Rewick with no explanation, no opportunity to be heard or any other information. This was also after Plaintiff reiterated the misuse of taxpayers' monies by all Defendants and after requesting information as to a subsequent Rice letter that was never provided.

299. The foregoing actions were taken pursuant to an official and extant policy and practice and were undertaken by individuals with final policymaking authority over such actions.

300. The foregoing actions were undertaken by Defendant Board and Defendants Kazan, DiLollo, Rewick and Toback working in concert with them, all of whom were in a position to cease such unlawful conduct. Instead, these Defendants condoned and ratified such unlawful and/or negligent conduct.

301. The actions of these Defendants violated the New Jersey Civil Rights Act ("NJCRA") N.J.S.A. 10:6-1 et seq.

302. These Defendants deprived Plaintiff of rights, privileges and/or immunities secured by the Constitution and laws of the State of New Jersey.

303. As a result of the unlawful acts of these Defendants, Plaintiff's exercise and/or enjoyment of these rights, privileges or immunities were interfered with, or attempted to be interfered with, by a person acting under color of law.

304. As a result of the conduct of these Defendants, as enumerated herein, Plaintiff has suffered economic and non-economic/emotional distress damages, resulting in the loss of compensation, reputational damages, loss of earning power, loss of self-esteem, loss of standing in the community, mental injury, the loss of opportunities for prospective employment, and is incurring legal expenses and other expenses as a result of Defendants' actions.

   **WHEREFORE,** Plaintiff demands judgment against the Defendant Board and Defendants DiLollo, Rewick and Toback for compensatory damages, consequential damages, punitive damages, attorney fees, interest, costs of suit and such other relief as the Court deems just and equitable.

## COUNT FIVE

### (Civil Conspiracy)

305. Plaintiff repeats and realleges all the foregoing allegations and facts as if set forth herein.

306. In early December 2020, the Booster Defendants were misusing their by-laws again.

307. Because of this conduct, Defendant DiLollo advised the Booster Defendants to hold off on announcing any "election" results

and scheduled a Zoom call that would take place with him and Defendant Rewick on December 7, 2020.

308. On December 4, 2020, Plaintiff acting in accordance with his performance responsibilities (C-322) was professionally obligated to call on his superiors to properly adjudicate the election fraud as per Board Policy 0133.

309. Plaintiff followed the chain of command and sent a letter Defendants Rewick and DiLollo that also included Defendant Toback, who was already made aware of the Booster Defendants' conduct in restricting a parent, Mr. Gilligan, from seeking an officer position in the booster club.

310. Plaintiff requested for the school employees including Defendant Toback to properly adjudicate this dispute in a manner that would be both consistent with the booster club by-laws and Board Policy 9191.

311. In the days that followed, Defendant Kazan, the Defendant Board and Defendant Toback retaliated against Plaintiff for requesting that his superiors resolve the election fraud being committed by the Booster Defendants.

312. The School Defendants were well aware of the election fraud being committed by the Booster Defendants with respect to school-sponsored program – the baseball team.

313. On the morning of December 7, 2020, Plaintiff exchanged text messages with Defendant DiLollo to see if the Booster Defendants

confirmed their availability for the scheduled meeting. DiLollo sarcastically texted, "It's better than that."

314. Defendant DiLollo called Plaintiff and asked Plaintiff about a book he published approximately 9 years ago and indicated that Defendant Toback wanted a copy. More alarming, Defendant DiLollo stated that Defendant Toback intended on speaking with the Defendant Board about his book.

315. Defendant DiLollo then informed Plaintiff of disparaging comments made by Defendants O'Mealy, Casamassina and D'Agati about Plaintiff over the prior weekend, December 5-6, 2020.

316. Specifically, within 48 hours of an actual election for booster club officers, Defendant DiLollo advised Plaintiff that Defendants O'Mealy, Casamassina and D'Agati personally delivered a copy of Plaintiff's book to members of the Defendant Board, including Defendant Kazan on or about December 5-6, 2020 with the specific intent to place Plaintiff in a false light so his employment would be in jeopardy.

317. Based on this, Defendant Toback demanded Defendant DiLollo find out what Plaintiff stated in his book about "booster clubs" because Defendants O'Mealy, Casamassina and D'Agati made allegations that Plaintiff had a personal agenda as to the Defendant Booster Club as contained in Plaintiff's book.

318. Over that weekend, Defendants O'Mealy, Casamassina and D'Agati intentionally misrepresented the contents of Plaintiff's

76

book to his employer in a desperate attempt to divert attention away from the election fraud they had been committing in an effort to spare themselves from having the booster club being dissolved for a third time or at a minimum, an attempt to prevent them from being removed from the Defendant Booster Club and/or not being permitted to hold an officer position.

319. The result of the false allegations against Plaintiff was the School Defendant scheduling a meeting to now discuss Plaintiff's employment.

320. The Zoom meeting to rectify the election fraud committed by the Booster Defendants was canceled and the focus became Plaintiff.

321. The Booster Defendants in conjunction with Defendant Kazan and now Defendant Toback were utilizing Plaintiff's book from 9 years prior to malign Plaintiff in order to get him terminated.

322. Plaintiff's book was published in 2011 which pertained to his journey in becoming a head coach in baseball at the age of 23, which included issues that he had to overcome that occurred more than 20 years ago at another school.

323. Although the Defendant Board was aware of Plaintiff's book for at least 3 years, it was now utilizing it to try and manufacture a reason to terminate Plaintiff.

324. At 12:10 p.m. on December 7, 2020, Plaintiff was advised by a friend, Pat Hardin, that Defendant DiLollo admitted that Defendants O'Mealy, Cassamasina, and D'Agati brought Plaintiff's

book to members of the Defendant Board over the past weekend (December 5-6, 2020) which resulted in Plaintiff becoming the target of possible termination. This was just prior to the meeting wherein Defendants Rewick and DiLollo were going to put a stop to the fraudulent election for the Defendant Booster Club.

325. Realizing the School Defendants had no logical or rational reason to overlook the rampant election fraud by the Booster Defendants, and to now "investigate" Plaintiff based on false representations by Defendants O'Mealy, Cassamasina, and D'Agati, Plaintiff sent a text message to Defendant DiLollo on December 7, 2020 at 12:22 p.m. and stated, "It's urgent that we speak as I'm considering an ethics complaint against the Board President (Defendant Kazan) to the State Department of Education. I'm also considering self-report to NJSIAA for boosters paying cash to students."

326. A few hours later, Defendant DiLollo texted Plaintiff at 3:38 p.m. requesting Plaintiff to call him. During this call, Defendant DiLollo told Plaintiff that he would be receiving a Rice notice regarding his baseball position. This was directly related to Defendants O'Mealy, Cassamasina, and D'Agati making false claims about Plaintiff based on Plaintiff's book.

327. The School Defendants no longer pursued rectifying the fraudulent elections and by-laws of the school-sponsored booster club. In failing to do so, they violated Board Policy 0133. This

issue affected not only the Plaintiff but all parents of baseball players and the tax payers of the district.

328. The Booster Defendants succeeded in rigging their election as they all won a seat running unopposed because they would not permit Mr. Gilligan and others from running which was supported by the School Defendants.

329. In failing to adjudicate the election fraud, the School Defendants violated Board Policy 0142 and N.J.S.A. 18A:12-24.1 as they failed to support Plaintiff in proper performance of his duties (C-322).

330. If the School Defendants had any questions or concerns about the contents of Plaintiff's book, or any of the events that he wrote about, some of which had occurred 21 years prior, they could have, and should have, still rectified the election fraud issues.

331. Defendant Toback never followed up with Mr. Gilligan in any way despite his complaint of the Booster Defendants misusing by-laws.

332. Defendant Rewick was assigned by Defendant Kazan and Defendant Toback to run the booster club election. No one contacted Mr. Gilligan despite previously advising Mr. Gilligan the election had been put on hold.

333. Based on this, Mr. Gilligan felt betrayed and was incensed at the corruption of all of the Defendants.

334. On December 10, 2020, Defendant Rewick called Plaintiff to discuss the situation.

335. Defendant Rewick advised Plaintiff that the Booster Defendants made another inflammatory, false allegation against Plaintiff.

336. In doing so, the Booster Defendants accused Plaintiff of improperly attempting to influence the booster club election in order to get Mr. Gilligan elected for the sole purpose of ensuring his assistant coaches got paid.

337. Plaintiff adamantly denied this claim and stated that the election for a booster club that is supposed to be working in conjunction with him was being done without his knowledge and based on made up by-laws. Since Plaintiff had a professional obligation relative to his job description (C-322) to report this infraction to his superiors and ask them for their help, his obligation rendered the Booster Defendants' faulty claim to be another attempt to disparage Plaintiff.

338. Defendant Rewick then asked Plaintiff if he had asked the Defendant Booster Club to pay the assistant coaches as if Plaintiff had done something wrong or outside of the NFHS Guidelines. He then requested documentation regarding Plaintiff's request for his coaches to be paid, which Plaintiff readily provided in two emails dated December 10, 2020.

339. The payments to the assistant coaches were based on past years, Governor Murphy's Executive Orders and NFHS Guidelines. Furthermore, NFHS Guidelines prohibit booster club members from utilizing funds for the purpose of controlling the hiring and firing of a coach which is exactly what the Booster Defendants were trying to do evidenced by Defendant Rewick demanding Plaintiff's written requests that his assistant coaches be paid.

340. More alarming, Defendant Rewick then advised Plaintiff of yet another false allegation made by the Booster Defendants.

341. In this respect, Defendant Rewick stated that when Defendants O'Mealy, Casamassina and D'Agati brought Plaintiff's book to Defendant Kazan and other members of the Defendant Board on December 5-6, 2020, they made the false contention that Plaintiff wanted players to do winter training at Mr. Gilligan's facility because Plaintiff was receiving monetary kickbacks from Mr. Gilligan.

342. This was a knowingly false statement to place Plaintiff in a false light with her employer. In addition, this was done to create some type of justification to have Plaintiff terminated.

343. This allegation was communicated to Plaintiff by Defendant Rewick, the Principal and one of the highest ranking officials in the school, who advised that this information came directly from Defendants O'Mealy, Casamassina and D'Agati during closed door discussions with Defendant Kazan over that weekend.

81

344. The allegation was deemed true enough for Defendant Rewick that he demanded Plaintiff provide him with any documentation or proof to disprove Defendants O'Mealy, Casamassina and D'Agati claims that Mr. Gilligan was providing monetary kickbacks to him.

345. Plaintiff was also advised by an employee of the Defendant Board that this false claim was, in fact, made by Defendants O'Mealy, Casamassina and D'Agati when he was waiting for his Rice notice.

346. At 8:01 p.m. on December 10, 2020, Plaintiff forwarded an email to Defendant Rewick discrediting the false claims made by Defendants O'Mealy, Casamassina and D'Agati. The email was from November 27, 2019 specifically noting that the winter program was "voluntary."

347. On December 10, 2020 at 8:17 p.m., Plaintiff sent a text message to Defendant DiLollo expressing his shock as to what Defendant Rewick confronted him with and that the false claims by Defendants O'Mealy, Casamassina and D'Agati were shared with him and members of the Defendant Board. Defendant DiLollo, who had heard these false claims, described the situation as "crazy."

348. The next day, Plaintiff shared this false claim with Mr. Gilligan who was shocked and highly offended.

349. Plaintiff is also in possession of an email sent to the Wayne Administration in May of 2021 by baseball parent Scott Appel in which he referenced Plaintiff by stating "The past coach did what

he did, unethical and all." This shows that the defamatory statements by Defendants Casamassina, O'Mealy, and D'Agati had been published to third parties.

350. It was now clear that Defendant Rewick and Defendant DiLollo had changed their tone and flipped their position on the entire situation, making Plaintiff the scapegoat. The perpetual defamation and slander that Defendants Casamassina, O'Mealy, and D'Agati had shared with board members between December 4 and December 10, 2020 negated the fact that Ms. Weir had vowed along with Central Office staff not to let parents fire another coach by violating Board Policy 0120.

351. Defendant Rewick then began a course of conduct of trying to somehow substantiate the allegations by the Booster Defendants.

352. Plaintiff complained to Defendant Rewick that he could not believe that Defendant Rewick was now siding with the Booster Defendants, who he knew violated laws and school policies.

353. Defendant Rewick was being directed by the Defendant Board and Defendant Toback to go after Plaintiff to appease the Booster Defendants based on their conspired claims.

354. Oddly, after Plaintiff stated his disbelief, Defendant Rewick stated that Plaintiff was a good guy and called the Defendants O'Mealy, Casamassina and D'Agati "scumbags."

355. Defendant Rewick also stated that this was being orchestrated at a level above him and then stated a familiar phrase "there are hills that you die on."

356. In short, Defendant Toback, who wanted a new contract, made the decision to cater to Defendants O'Mealy, Casamassina and D'Agati by accepting their false allegations in order to have Plaintiff removed as coach. This is a clear violation of Board Policies # 0120, #0142, and N.J.S.A. 18A:12-24.

357. After this conversation, and based on the Rice notice, as well as the fact that Plaintiff was now made aware of how he was being maligned by Defendants O'Mealy, Casamassina and D'Agati sent a text message to Defendant DiLollo to advise him that he wanted his employment discussed in open session and that he had hired an attorney.

358. On December 11, 2020, Defendant DiLollo called Plaintiff and advised him that he had been given a directive to no longer communicate with Plaintiff going forward. Defendant DiLollo then apologized to Plaintiff for being put through this ordeal.

359. Plaintiff was stunned and could not believe his immediate supervisor was no longer permitted to talk to him prior to his position even being discussed by the Defendant Board.

360. On December 15, 2020, Plaintiff received his Rice notice for the Board of Education meeting on December 17, 2020. This meeting was postponed due to weather and rescheduled for December 21, 2020.

361. At the Board of Education meeting on December 21, 2021, no action was taken and no information was provided to Plaintiff.

362. On January 14, 2021, Plaintiff still had received no information or update regarding the closed session meeting during the December 21, 2021 Board of Education meeting. However, 59 Spring coaches between Wayne Hills and Wayne Valley had been approved, excluding Plaintiff.

363. On January 15, 2021, despite approving 59 coaches, Defendant DiLollo sent an email which advertised all Spring coaching positions.

364. Despite not providing another Rice notice and based on the false allegations made by Defendants O'Mealy, Casamassina, D'Agati and Kazan, Plaintiff was terminated from his coaching position on January 19, 2021.

365. Under the guise of creating the impression that Plaintiff somehow conducted himself inappropriately, including orchestrating an unlawful and unethical monetary kickback scheme with respect to baseball winter workouts, Defendants O'Mealy, Casamassina, D'Agati and Kazan committed the acts alleged herein pursuant to, and in furtherance of, their conspiracy to have Plaintiff terminated from his head baseball coaching position.

366. These Defendants engaged in a concerted and cooperative effort to harm and/or destroy Plaintiff's reputation in the public and to the Defendant Board in order to justify terminating

Plaintiff from his coaching position as the Boys' Head Varsity Baseball coach.

367. Specifically, Defendants O'Mealy, Casamassina, D'Agati made defamatory and false allegations as to Plaintiff's character to place him in a false light in order to terminate him as the Boys' Head Varsity Baseball coach after much success.

368. The negligent, reckless and/or intentional statements were undertaken solely for purposes of irreparably harming Plaintiff by labelling him as a coach who acted inappropriately in order to strip him of his coaching position, thereby destroying Plaintiff's reputation in the community within which he resides, as well as New Jersey's coaching community.

369. As a proximate result of the wrongful acts herein alleged, Plaintiff has been, and will continue, to suffer damages.

370. Plaintiff alleges special damages.

371. Defendants' actions were undertaken with malice for purposes of oppressing Plaintiff. Plaintiff is therefore entitled to exemplary or punitive damages.

372. Plaintiff has suffered economic and non-economic/emotional distress damages, resulting in the loss of compensation, reputational damages, loss of earning power, loss of self-esteem, loss of standing in the community, mental injury, the loss of opportunities for prospective employment, and is incurring legal expenses and other expenses as a result of Defendants' actions.

373. JOHN DOES 1-10, being fictitious individuals currently unknown to Plaintiff and ABC CORP 1-10, being fictitious corporations currently unknown to Plaintiff, have engaged in intentional or malicious acts to interfere with Plaintiffs' legitimate pursuits, including without limitation misappropriating confidential and proprietary information belonging to Plaintiff, knowingly receiving confidential customer information to conspire with Defendants.

**WHEREFORE,** Plaintiff demands judgment against Defendants O'Mealy, Casamassina, D'Agati and Kazan for compensatory damages, consequential damages, punitive damages, attorney fees, interest, costs of suit, and such other relief as the Court deems just and equitable.

## COUNT SIX

### (Tortious Interference with Economic Advantage)

374. Plaintiff repeats and re-alleges all the foregoing allegations as if set forth herein.

375. The statements and actions taken by Defendants O'Mealy, Casamassina, D'Agati and Kazan were specifically made in order to ensure Plaintiff was terminated from his coaching position as noted in Paragraphs 164 through 240 and 306 through 341.

376. These Defendants' negligent, reckless and/or intentional interference was motivated for purposes of inflicting injury to Plaintiff.

377. The tortious interference by said Defendants has resulted in a loss of income to the Plaintiff as he was terminated via email dated January 19, 2021.

378. Although Defendant Kazan is a member of the Defendant Board, she is only one vote on said Board.

379. Defendant Kazan advocated to have Plaintiff terminated based on the false claims made by Defendants O'Mealy, Casamassina, D'Agati, which she repeated and supported.

380. As a direct and proximate result of said Defendants' conduct, Plaintiff has suffered economic and non-economic/emotional distress damages, resulting in the loss of compensation, reputational damages, loss of earning power, loss of self-esteem, loss of standing in the community, mental injury, the loss of opportunities for prospective employment, and is incurring legal expenses and other expenses as a result of Defendants' actions.

**WHEREFORE,** Plaintiff demands judgment against Defendants O'Mealy, Casamassina, D'Agati and Kazan for compensatory damages, consequential damages, punitive damages, attorney fees if applicable, interest, costs of suit and such other relief as the Court deems just and equitable.

## COUNT SEVEN

### (False Light)

381. Plaintiff repeats and re-alleges all the foregoing allegations as if set forth herein.

88

382. Paragraphs 164 through 240 and 306 through 341 set forth the specific facts of the disparaging statements made by Defendants O'Mealy, Casamassina, D'Agati and Kazan which were used to justify the termination of Plaintiff on January 21, 2021.

383. On the morning of December 7, 2020, Plaintiff exchanged text messages with Defendant DiLollo to see if the Booster Defendants confirmed their availability for the scheduled meeting. DiLollo sarcastically texted, "It's better than that."

384. Defendant DiLollo called Plaintiff and asked Plaintiff about a book he published approximately 9 years ago and indicated that Defendant Toback wanted a copy. More alarming, Defendant DiLollo stated that Defendant Toback intended on speaking with the Defendant Board about his book.

385. On the morning of December 7, 2020, Plaintiff exchanged text messages with Defendant DiLollo to see if the Booster Defendants confirmed their availability for the scheduled meeting. DiLollo sarcastically texted, "It's better than that."

386. Defendant DiLollo called Plaintiff and asked Plaintiff about a book he published approximately 9 years ago and indicated that Defendant Toback wanted a copy. More alarming, Defendant DiLollo stated that Defendant Toback intended on speaking with the Defendant Board about his book.

387. At 12:10 p.m. on December 7, 2020, Plaintiff was advised by a friend, Pat Hardin, that Defendant DiLollo admitted that

Defendants O'Mealy, Cassamasina, and D'Agati brought Plaintiff's book to members of the Defendant Board over the past weekend (December 5-6, 2020) which resulted in Plaintiff becoming the target of possible termination. This was just prior to the meeting wherein Defendants Rewick and DiLollo were going to put a stop to the fraudulent election for the Defendant Booster Club.

388. Based on the statements and actions made by Defendants O'Mealy, Casamassina, D'Agati and Kazan, Plaintiff's reputation was irreparably damaged.

389. Said Defendants specifically published false statements Defendants DiLollo, Rewick and Toback that Plaintiff claimed that Plaintiff had malicious intentions as to the Defendant Booster Club as contained in Plaintiff's book published over 10 years ago, Plaintiff wanted players to do winter training at Mr. Gilligan's facility because he was receiving monetary kickbacks from Mr. Gilligan and Plaintiff wanted to misuse booster funds to pay assistant coaches.

390. These Defendants' negligent, reckless and/or intentional interference was motivated for purposes of inflicting injury to Plaintiff.

391. The actions of these Defendants were negligent, reckless and/or intentional and meant to strip Plaintiff of his long-standing coaching position.

392. Based on the improper actions of these Defendants, Plaintiff was terminated from his coaching position on January 19, 2021.

393. The actions of these Defendants shone a negative light on Plaintiff.

394. By their statements and other conduct, these Defendants' intentionally misrepresented Plaintiff's character in a way that they knew Plaintiff would reasonably be justified in the eyes of the community in feeling seriously offended and aggrieved by such publicity.

395. The negligent, reckless and/or intentional acts of these Defendants as outlined in this Complaint would be offensive to any reasonable person such as the Plaintiff.

396. The negative light that was shone on Plaintiff has caused reputational damage and has caused him financial damages, inability to obtain coaching positions, emotional distress and loss of self-esteem.

397. The actions of these Defendants have caused compensatory damages and irreparable damage to the reputation of the Plaintiff.

**WHEREFORE,** Plaintiff demands judgment against Defendants O'Mealy, Casamassina, D'Agati and Kazan for compensatory damages, consequential damages, punitive damages, attorney fees if applicable, interest, costs of suit and such other relief as the Court deems just and equitable.

**COUNT EIGHT**

**(Defamation)**

398. Plaintiff repeats and re-alleges all the foregoing allegations as if set forth herein.

399. Paragraphs 164 through 240, 306 through 341 and 382 through 392 set forth the specific facts regarding this claim.

400. Defendants O'Mealy, Casamassina, D'Agati and Kazan negligently, recklessly and/or intentionally made an improper and false statements about Plaintiff so he would be terminated from his coaching position and to poison Plaintiff for other potential coaching positions.

401. Because of the false statements made about Plaintiff, Plaintiff was, in fact, terminated January 19, 2021.

402. These Defendants' false statements and allegations have negatively affected Plaintiff and has caused his reputation as a coach to be tarnished.

403. Said Defendants' false statements, which were published to third parties, including the School Defendants, subjected Plaintiff to contempt, and ridicule, tended to and did in fact diminish the esteem, respect, goodwill or confidence in which Plaintiff was held, or otherwise excited adverse, derogatory, and unpleasant feelings or opinions against Plaintiff. These Defendants' false statements intended to and did in fact harm Plaintiff in his profession as well.

404. Publication was made to other third parties as evidenced by an email sent to the Wayne Administration in May of 2021 by baseball parent Scott Appel in which he referenced Plaintiff by stating "The past coach did what he did, unethical and all."

405. As a direct and proximate result of the actions alleged herein, Plaintiff has suffered and will continue to suffer both economic and non-economic damages, including but not limited to pain and suffering, mental anguish, emotional distress, physical manifestations of injury, loss of employment opportunities and compensation, pension or retirement benefit reduction, and other such damages compensable under New Jersey law.

**WHEREFORE,** Plaintiff demands judgment against Defendants O'Mealy, Casamassina, D'Agati and Kazan for compensatory damages, consequential damages, punitive damages, attorney fees if applicable, interest, costs of suit and such other relief as the Court deems just and equitable.

## DESIGNATION OF TRIAL COUNSEL

You are hereby notified that Steven D. Farsiou, Esq. is assigned to try this case.

## <u>DEMAND FOR TRIAL BY JURY</u>

This party hereby demands trial by jury as to all issues raised by the Pleadings.

TRINITY & FARSIOU, LLC
Attorneys for Plaintiff


By: <u>*/s/ Steven D. Farsiou*</u>
STEVEN D. FARSIOU


## <u>RULE 1:38-7 CERTIFICATION</u>

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with Rule 1:38-7(b).


TRINITY & FARSIOU, LLC
Attorneys for Plaintiff


By: <u>*/s/ Steven D. Farsiou*</u>
STEVEN D. FARSIOU

DATED:    October 31, 2022

## RULE 4:5-1 CERTIFICATION

The undersigned hereby certifies that:

1.  I am an attorney at law of the State of New Jersey and a Member with the Law Firm of Trinity & Farsiou, LLC. In that capacity, I am familiar with the facts of this case.

2.  To the best of my knowledge, information and belief, our investigation and investigation on behalf of our client has disclosed no other action or arbitration pending concerning the subject matter of this action. In addition, as of this date, there are no actions or arbitrations contemplated which relate to this matter.

3.  I am also aware that I am permitted to plead both a claim under the New Jersey Conscientious Employee Protection Act ("CEPA") and under common law pursuant to Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 57 (1980) as long as one of these causes of action is dismissed prior to trial. Maw v. Advanced Clinical Communications, Inc., 359 N.J. Super. 420, 440-41 (App. Div. 2003), rev'd on other grounds, 179 N.J. 43 (2004) (Supreme Court held that it would be unjust to force a party into making a decision at the pleading stage of the proceedings).

4.  I am aware of my continuing obligation during the course of this litigation to file and serve on all parties and with the Court an Amended Certification if there is a change in the facts stated in this Certification.

5.    I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

**TRINITY & FARSIOU, LLC**
Attorneys for Plaintiff


By:  ***/s/ Steven D. Farsiou***
STEVEN D. FARSIOU

DATED:    October 31, 2022