**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SCOTT ILLIANO, <br><br> Plaintiff, <br><br> v. <br><br> WAYNE BOARD OF EDUCATION, *et al.*, <br><br> Defendants. | Civil Action No. 22-114 (SDW) (JBC) <br><br> **OPINION** <br><br> February 20, 2024 |

**WIGENTON**, District Judge.

Before this Court are motions to partially dismiss Plaintiff Scott Illiano's ("Plaintiff") Second Amended Complaint (DE. 47 ("SAC")) filed by two sets of Defendants: (1) Defendants Melissa Casamassina ("Booster Club VP Casamassina"), Katherine D'Agati ("Booster Club Secretary D'Agati"), Pam O'Mealy ("Booster Club President O'Mealy"), and the Wayne Hills Baseball Booster Club ("Booster Club," and collectively, the "Booster Club Defendants") (D.E. 53 ("Booster Club MTD")); and (2) Defendants Michael Bubba ("BOE Member Bubba"), Jeff DiLollo ("Assistant Principal of Athletics DiLollo"), Catherine Kazan ("BOE President Kazan"), Michael Rewick ("Principal Rewick"), Mark Toback ("Superintendent Toback"), and the Wayne Board of Education ("BOE," and collectively, the "School Defendants"). (D.E. 54 ("BOE MTD").) Jurisdiction is proper pursuant to 28 U.S.C. § 1331. Venue is proper pursuant to 28 U.S.C. § 1441(a). This opinion is issued without oral argument pursuant to Rule 78. For the reasons stated below, the Booster Club MTD is **GRANTED IN PART AND DENIED IN PART**, and the BOE MTD is **GRANTED IN PART AND DENIED IN PART**.

1

I. **BACKGROUND AND FACTUAL HISTORY**

From 2011 until November 2017, the Wayne Hills High School ("WHHS") baseball program was allegedly in disarray—the team had just experienced a season with 11 wins and 16 losses, and over the previous six seasons, the team had five coaching changes. (D.E. 47 ¶¶ 15–16, 21.) In or around November 2017, Plaintiff, "one of the most respected baseball coaches in [New Jersey,]" became head baseball coach at WHHS. (*Id.* ¶¶ 14–15.) During the hiring process and upon taking the job, Plaintiff learned of several issues with the baseball program, including its "miniscule budget of approximately $3,500," and its lack of assistant coach positions—the team had two paid assistant coach positions while five "were required for proper supervision" of the student-athletes. (*Id.* ¶¶ 22–23, 36.)

To address these concerns, then-Athletic Director Richard Portfido ("Portfido") and Superintendent Toback told Plaintiff that he could fundraise, and that they would support his efforts to do so. (*Id.* ¶ 22.) Moreover, Portfido[1] suggested to Plaintiff "that he could subsidize his coaching staff through booster funds as other [WHHS] sports programs did." (*Id.* ¶ 23.) Plaintiff, accordingly, "would have to rely on booster funding for both essential purchases of team equipment and to subsidize [the] coaching staff." (*Id.* ¶ 44.) This case arises from Plaintiff's contentious relationship with the Booster Club which, he alleges, led to his eventual termination.

A. **Plaintiff and the Booster Club**

In January 2018, Plaintiff attended his first Booster Club meeting, during which he pitched a "3[-]phase, 12-month plan to rejuvenate" the baseball program. (*Id.* ¶ 39.) The Booster Club offered their full support for the plan, and so Plaintiff turned to them to request funds for

---

[1] Assistant Principal of Athletics DiLollo became the Athletic Director of WHHS in the summer of 2019. (*Id.* ¶ 51.)

equipment, stipends to pay the assistant coaches, and other team-related expenses. (*Id.* ¶¶ 36, 40–41.) Plaintiff's cordial relationship with the Booster Club, however, was short lived.

Almost immediately after the January 2018 meeting, Plaintiff began having issues with the Booster Club, including but not limited to its lengthy equipment-purchasing process, its failure to follow its own by-laws, and its attempts to undermine Plaintiff. (*Id.* ¶¶ 42–44, 46, 49.) In addition, Plaintiff alleges that, from June 2018 through December 2020, the Booster Club committed a litany of violations of BOE policies, Executive Orders implemented by Governor Phil Murphy ("Executive Orders"), and regulations propounded by the New Jersey State Interscholastic Athletic Association ("NJSIAA"). According to the SAC, the Booster Club, *inter alia*, impermissibly allowed alcohol to be served at a June 2018 end-of-season team banquet (*id.* ¶¶ 48–49); rigged the Booster Club elections (*id.* ¶ 227); disputed Plaintiff's fundraising efforts (*id.* ¶¶ 49, 156); delayed necessary equipment purchases (*id.* ¶ 49); conducted secret meetings to complain about Plaintiff and to create a plan to undermine him (*id.* ¶¶ 58, 98, 120, 141, 154); gifted WHHS senior players $100 gift cards allegedly in violation of NJSIAA rules (*id.* ¶¶ 116); and, purportedly in violation of Executive Orders, ignored requests to pay assistant coaches and held certain mass in-person gatherings during the COVID-19 pandemic (*id.* ¶¶ 122–24, 135–39.)

### B. Plaintiff Reports the Booster Club's Misconduct and Is Terminated

The SAC alleges that Plaintiff reported many of the aforementioned incidents and violations to Portfido, Principal Rewick, Assistant Principal of Athletics DiLollo, and the BOE. (*Id.* ¶¶ 45, 48, 52–57, 60–61, 68–71, 81, 103–05, 130, 136, 140, 183–85, 200–01, 224.) Plaintiff also routinely reported to his superiors that the Booster Club was not in compliance with Board Policy 9191.[2] (D.E. 47 ¶¶ 46–48, 52–55, 59, 63, 200.) Because of Plaintiff's complaints, several

---

[2] Policy 9191 provides, in relevant part:

of the School Defendants—led by Assistant Principal of Athletics DiLollo—sought to bring the Booster Club into compliance with Board Policy 9191. (*Id.* ¶¶ 62–70, 77–78, 140–47.) When those attempts failed, the Booster Club was suspended on two separate occasions in 2019 and 2020. (*Id.* ¶¶ 77, 141–47.) Those suspensions did not last long, however; each time the Booster Club was suspended, the BOE overturned it. (*Id.* ¶¶ 96–98, 165, 170.) Plaintiff contends that, by failing to ensure the Booster Club complied with Board Policy 9191, the BOE, too, violated the policy. (*Id.* ¶¶ 98–101, 153–56, 165–70.)

---

The Board of Education recognizes that the support offered by booster clubs can benefit the school district. Because the activities of booster clubs also reflect on the district, the Board establishes guidelines for the operation of booster clubs in order to ensure that their activities assist in the attainment of district goals and objectives.

A booster club that is organized for the purpose of endorsing and supporting a school sponsored activity shall:

1. Be incorporated as a nonprofit organization and file a copy of the certificate of formation with the School Business Administrator;

2. Enter into a contract with this Board for the conduct of intended activities;

3. Obtain liability insurance indemnifying the Board against all suits arising from the conduct of club activities and file a copy of the insurance certificate with the School Business Administrator;.

4. Account to the Board for all funds raised through the conduct of school related activities by filing an annual report with the School Business Administrator;

5. Utilize all funds raised through the conduct of school related activities for the benefit of school programs;

6. Certify adherence to the policies of the school district;

7. Request, in writing, permission of the Board before taking any group of pupils on a trip; and

8. Obtain written approval of the Superintendent or designee before raising funds in the name of the district.

Nothing in this policy shall be construed as the Board's assumption of responsibility for any activity conducted by a booster club.

WAYNE TWP. BD. OF EDUC., N.J., DISTRICT POLICY 9191 (2009), https://www.straussesmay.com/seportal/Public/DistrictPolicy.aspx?policyid=9191&id=6218b96ed1f54935af593c79cd329a04 (last visited Feb. 14, 2024).

4

Plaintiff alleges that, thereafter, the Booster Club and members of the BOE began a retaliatory campaign against him by claiming that he was taking monetary kickbacks, asserting that he tried to improperly influence Booster Club elections, and misrepresenting the contents of a book he wrote in 2011. (*Id.* ¶¶ 155, 213–23, 233, 239–41, 285.) Ultimately, on January 19, 2021, Principal Rewick sent an email to Plaintiff informing him that he was terminated as head coach of the baseball team. (*Id.* ¶ 269.)

### C. Procedural History

In December 2021, Plaintiff initiated this action in New Jersey state court, asserting eight counts: (1) 42 U.S.C. § 1983; (2) New Jersey Conscientious Employee Protection Act ("CEPA"); (3) wrongful termination; (4) First Amendment Retaliation; (5) civil conspiracy; (6) tortious interference with economic advantage; (7) false light; and (8) defamation. (*See generally* D.E. 1.) On January 10, 2022, the then-named Defendants removed the action to this Court. (*Id.*) Three months later, the then-named Defendants moved to dismiss the original complaint, which this Court granted on September 30, 2022. (D.E. 4, 11, 12.) Thereafter, Plaintiff filed an amended complaint, and the then-named Defendants again moved to dismiss it. (D.E. 14, 18, 22.) The parties timely completed briefing. (D.E. 18, 22, 23, 26, 29, 31.) While those motions were pending before this Court, Plaintiff sought leave to file a second amended complaint, which was granted by Magistrate Judge James B. Clark on June 7, 2023. (D.E. 44, 45.) One week later, Plaintiff filed the SAC in which he named the same set of Defendants as well as BOE Member Bubba. (D.E. 47.) On July 11, 2023, both sets of defendants moved to partially dismiss the SAC, and the parties timely completed briefing. (D.E. 53, 54, 59, 60, 66, 67.)

## II.  LEGAL STANDARD

An adequate complaint must be "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 8(a)(2). This Rule "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level[.]" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted); *see also Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008) (stating that Rule 8 "requires a 'showing,' rather than a blanket assertion, of an entitlement to relief").

In considering a motion to dismiss pursuant to Rule 12(b)(6), a district court must conduct a three-step analysis. First, it must "tak[e] note of the elements a plaintiff must plead to state a claim." *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 904 (3d Cir. 2021) (alteration in original) (quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010)). Second, the court "disregard[s] threadbare recitals of the elements of a cause of action, legal conclusions, and conclusory statements." *Id.* (quoting *James v. City of Wilkes-Barre*, 700 F.3d 675, 681 (3d Cir. 2012)). Third, the court assumes the veracity of all well-pleaded factual allegations, "constru[es] them in the light most favorable to the plaintiff, and draw[s] all reasonable inferences in the plaintiff's favor." *Lutz v. Portfolio Recovery Assocs., LLC*, 49 F.4th 323, 328 (3d Cir. 2022). "If, after completing this process, the complaint alleges 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of' the necessary elements of a claim, then it plausibly pleads a claim." *Id.* (alteration in original) (quoting *Twombly*, 550 U.S. at 556). Determining whether the allegations in a complaint are "plausible" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). If the "well-pleaded facts do not permit the court to infer more

6

than the mere possibility of misconduct," the complaint should be dismissed for failing to "show[] that the pleader is entitled to relief" as required by Rule 8(a)(2). *Id.*

### III. DISCUSSION

#### A. Counts Two, Four, Five, Six, Seven, and Eight Against BOE President Kazan

At the outset, this Court notes that the SAC contains only conclusory allegations of wrongdoing by Defendant Kazan. (D.E. 47 ¶¶ 97–100, 179.) To be sure, the SAC alleges that Defendant Kazan was friends with some of the Booster Club officers, partook in the BOE's "mysterious decision to lift the . . . Booster Club's suspension," questioned Plaintiff multiple times as to the veracity of the Booster Club's allegations against him, and attended the BOE meetings at which the members discussed Plaintiff's termination. (*Id.*) This Court cannot infer Kazan's misconduct from those allegations, and it is axiomatic that this Court must disregard the SAC's conclusory allegations. *See Thanoo*, 999 F.3d at 904. Accordingly, this Court will dismiss without prejudice Counts Two, Four, Five, Six, Seven, and Eight as against Defendant Kazan.

#### B. Count Two (CEPA) Against the BOE, Bubba, DiLollo, Rewick, and Toback

The BOE, BOE Member Bubba, Principal Rewick, Superintendent Toback, and Assistant Principal of Athletics DiLollo (collectively, the "Remaining School Defendants") move to dismiss Count Two against them, arguing that because Plaintiff does not assert that he reported misconduct by his *employer*, he has failed to allege a *prima facie* CEPA claim. For the reasons set forth herein, this Court disagrees.

The CEPA prohibits employers from taking retaliatory action against an employee who reports on suspected illegal activity. N.J. Stat. Ann. § 34:19-3. To state a claim thereunder, a plaintiff must plead the following: (1) he reasonably believed defendants were violating a law, rule, or public policy; (2) that he performed a whistleblowing activity as defined by N.J. Stat. Ann.

7

§ 34:19-3; (3) that an adverse employment action was taken against him; and (4) that a causal relationship exists between the whistleblowing activity and the adverse employment action. *Puglia v. Elk Pipeline, Inc.*, 141 A.3d 1187, 1200 (N.J. 2016).  As this Court explained in its September 30 Opinion, "CEPA's protection does not extend to reports alleging the misconduct of non-employers." *Illiano v. Wayne Bd. of Educ. ("Illiano I")*, No. 22-114, 2022 WL 4596729, at *3 (D.N.J. Sept. 30, 2022) (collecting cases).  Rather, a plaintiff may only maintain a CEPA claim against his or her employer—*i.e.*, "the party with the power and responsibility to hire, promote, reinstate, provide back pay, and take other remedial action," *Abbamont v. Piscataway Twp. Bd. of Educ.*, 650 A.2d 958, 964 (N.J. 1994)—for the employer's "retaliatory action against [its] employees." *Figueroa v. City of Camden*, 580 F. Supp. 2d 390, 406 (D.N.J. 2008).

CEPA defines "employer" as the following:

> [A]ny individual, partnership, association, corporation or any person or group of persons acting directly or indirectly on behalf of or in the interest of an employer with the employer's consent and shall include all branches of State Government, or the several counties and municipalities thereof, or any other political subdivision of the State, or a school district, or any special district, or any authority, commission, or board or any other agency or instrumentality thereof.

N.J. Stat. Ann. § 34:19-2(a).  Because the CEPA imposes liability on those who act "directly or indirectly on behalf of or in the interest of an employer with the employer's consent," *id.*, the New Jersey Supreme Court has determined that both employers and employers' agents could be held liable for retaliation, *Palladino v. VNA of S. N.J., Inc.*, 68 F. Supp. 2d 455, 471–72 (D.N.J. 1999) (citing *Abbamont*, 650 A.2d at 968)).

Here, the SAC alleges facts sufficient to state a CEPA claim against Plaintiff's employer—the BOE—and its purported agents—Rewick, Toback, DiLollo, and Bubba.  According to the SAC, Plaintiff regularly complained to his superiors about the Booster Club's alleged misconduct

8

*and* the BOE's failure to exercise adequate oversight over it.  In turn, Plaintiff asserts, members of the BOE—primarily led by Defendant Bubba—retaliated against him, ultimately resulting in his termination.  Although the extent of each of the Remaining School Defendants' culpability is unclear, the factual allegations suggest that each of them was involved, at least in part, in Plaintiff's termination.  For instance, Defendants Principal Rewick and Assistant Principal of Athletics DiLollo supported Plaintiff throughout his disputes with the Booster Club, but they allegedly turned against him[3] (D.E. 47 ¶¶ 45, 48, 52–57, 60–61, 68–71, 81, 103–05, 130, 136, 140, 173, 184 – 85, 189, 239–50, 270–72); Superintendent Toback purportedly joined the retaliatory campaign against Plaintiff so that his contract as superintendent would be renewed (*id.* ¶¶ 177, 251, 418); Defendant Bubba was the apparent ringleader[4], planning with members of the Booster Club the way to get Plaintiff fired (*id.* ¶¶ 154–155, 200, 215); and, of course, the BOE terminated Plaintiff after a series of meetings that Plaintiff was not allowed to attend (*id.* ¶¶ 253–58, 269).  Accepting those factual allegations as true, as this Court must do at this stage, the SAC alleges sufficient facts to suggest that each of the Remaining School Defendants against whom Count Two is asserted played a part in retaliating against Plaintiff.  Accordingly, Count Two may proceed against them.

C.  **Count Three (*Pierce* Claim) Against the BOE**

The BOE moves to dismiss Plaintiff's *Pierce* claim, because, it argues, Plaintiff has failed to identify a clear mandate of public policy that was violated before or during his termination.  The BOE's arguments are unpersuasive at this stage of the litigation.

---

[3] Notably, Plaintiff alleges that Principal Rewick sent him the email informing him of his termination.  (*Id.* ¶ 270.)

[4] The SAC expressly alleges that Bubba exchanged several communications with the Booster Club Defendants.  In those alleged communications, the relevant Defendants oftentimes refer to a "plan," which, at this stage, this Court must infer was a plan to get Plaintiff terminated.  (*See, e.g.*, *id.* ¶ 155 (explaining that Bubba received a communication from Defendant Casamassina telling him that Plaintiff's book was "[j]ust another piece of the puzzle") & ¶ 200 ("Bubba . . . advise[d] the Booster Defendants [to] 'stick to the plan.'").)

9

In *Pierce v. Ortho Pharmaceutical Corporation*, the New Jersey Supreme Court explained that "an employee has a cause of action for wrongful discharge when the discharge is contrary to a clear mandate of public policy." 417 A.2d 505, 512 (N.J. 1980). Thus, an employee who is wrongfully discharged may maintain an action in tort "based on the duty of an employer not to discharge an employee who refused to perform an act that is a violation of a clear mandate of public policy." *Id.* "To establish a case for common law wrongful discharge, the employee must identify the clear mandate of public policy and that the discharge itself was in violation of that public policy." *Myers v. Advanced Stores Co.*, No. 19-18183, 2020 WL 2744632, at *6 (D.N.J. May 27, 2020) (citing *Tartaglia v. UBS PaineWebber Inc.*, 961 A.2d 1167, 1183 (N.J. 2008)). With respect to the first requirement, the New Jersey Supreme Court has also explained that "sources of public policy include legislation; administrative rules, regulations or decisions; and judicial decisions." *Pierce*, 417 A.2d at 512. Ultimately, "a 'clear mandate of public policy' must be one that on balance is beneficial to the public." *Hennessey v. Coastal Eagle Point Oil Co.*, 609 A.2d 11, 15 (N.J. 1992).

Here, Plaintiff adequately alleges that his termination violated a clear mandate of public policy. As an initial matter, the SAC alleges that Plaintiff repeatedly made his supervisors and the BOE aware of the Booster Club's repeated violations of state law, regulations, and executive orders.[5] And when the BOE began to directly undermine Plaintiff—and, indeed, appeared to approve of and collude with the Booster Club—Plaintiff began to report the BOE's failure to comply with Board Policy 9191, which "establishes guidelines for the operation of booster clubs . . . that [are] organized for the purpose of endorsing and supporting a school[-]sponsored activity." In sum, the SAC contains allegations that the Booster Club was subject to Board Policy 9191, it

---

[5] As explained earlier in this Opinion, these violations included alleged violations of COVID-19 regulations, Executive Orders issued by Governor Phil Murphy, NJSIAA regulations, and Board Policy 9191.

failed to comply therewith, Plaintiff reported the BOE's failure to oversee the Booster Club, and he was retaliated against because of his reporting. That is sufficient to state a claim under *Pierce*. 417 A.2d at 512 ("An employer's right to discharge an employee at will carries a correlative duty not to discharge an employee who declines to perform an act that would require a violation of a clear mandate of public policy.").

Although the BOE argues that the Booster Club was unsanctioned—and thus did not need to comply with the requirements of Board Policy 9191—the facts in the SAC belie that contention. To be sure, the allegations suggest that several of the School Defendants sought to bring the Booster Club into compliance with Board Policy 9191; on two occasions, the Booster Club was suspended or disbanded because of its failure to comply with Board Policy 9191; the BOE held several meetings with members of the Booster Club; and the BOE otherwise exercised significant oversight over the Booster Club in the form of planning and overseeing elections. In other words, the assertions in the SAC suggest that the Booster Club was acting under the express direction and active supervision of the BOE but without complying with Policy 9191. The BOE's failure here to comply with its unambiguous policies, and its decision to terminate Plaintiff for blowing the whistle on that alleged dereliction of duty, is undoubtedly a violation of a clear mandate of public policy. Therefore, the BOE's motion to dismiss is denied as to Count Three. [6]

---

[6] The BOE's contention that its complying with Board Policy 9191 would raise "obvious constitutional . . . issues" is overstated. (D.E. 54-1 at 22.) As an initial matter, the facts in the SAC suggest that several of the School Defendants believed that the BOE had a duty to oversee the Booster Club. In any event, the SAC indicates that the BOE, in fact, exercised significant control over the Booster Club, and in turn, the Booster Club exerted significant influence on the BOE. Given this allegedly extensive and interconnected relationship, the BOE cannot claim, at this stage, that it had no duty to ensure compliance with Board Policy 9191. Simply put, the BOE could not hold out the "Wayne Hills Baseball Booster Club" as one sanctioned by Board Policy 9191, but then disclaim responsibility when the Booster Club failed to comply therewith.

11

### D. Count Four (First Amendment Retaliation) Against the BOE, Bubba, DiLollo, Rewick, and Toback

Only Principal Rewick and Assistant Principal of Athletics DiLollo move to dismiss Count Four because, they insist, "th[e] Court previously dismissed [the] claim . . . on the basis that there were no well-pled facts showing they had any role in the decision to terminate [Plaintiff]." (D.E. 54-1 at 23.) The additional allegations in the SAC have cured this deficiency, and therefore, the claim may proceed against Principal Rewick and Assistant Principal of Athletics DiLollo.

In evaluating a public employee's retaliation claim for engaging in protected First Amendment activity, the court must undergo a three-step process. *Baldassare v. New Jersey,* 250 F.3d 188, 194 (3d Cir. 2001). "[A] public employee must show that (1) his speech is protected by the First Amendment and (2) the speech was a substantial or motivating factor in the alleged retaliatory action, which, if both are proved, shifts the burden to the employer to prove that (3) the same action would have been taken even if the speech had not occurred." *Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979, 986 (3d Cir. 2014) (citing *Gorum v. Sessoms,* 561 F.3d 179, 184 (3d Cir. 2009)).

As stated earlier in this Opinion, the allegations in the SAC and the inferences that can be drawn therefrom suggest that Principal Rewick and Assistant Principal of Athletics DiLollo were, at least to some extent, involved in the alleged retaliatory termination of Plaintiff. The SAC alleges that both Rewick and DiLollo fielded Plaintiff's complaints, and that, at some point, they turned against him. Moreover, the SAC alleges that both Rewick and DiLollo were involved in investigating Plaintiff allegedly because of his complaints of misconduct and a book he wrote in 2011—both of which are protected activities under the First Amendment. Accordingly, at this stage, Plaintiff has alleged enough to state a claim against Rewick and DiLollo.

### E. Count Six (Tortious Interference) Against Bubba, Casamassina, D'Agati, and O'Mealy

To state a claim under New Jersey law for tortious interference with prospective economic advantage, a plaintiff must allege: (1) the existence of a reasonable expectation of an economic advantage; (2) the interference was done intentionally and with malice; (3) absent the interference, there was as reasonable probability that the plaintiff would have received the anticipated economic benefits, and (4) the injury caused the damage. *MacDougall v. Weichert*, 677.2d 162, 174 (N.J. 1996) (citation omitted). In *Printing Mart-Morristown v. Sharp Electronics Corporation*, the Supreme Court of New Jersey explained that "it is 'fundamental' to a cause of action for tortious interference with a prospective economic relationship that the claim be directed against defendants who are not parties to the relationship." 563 A.2d 31, 37–38 (N.J. 1989) (collecting cases). Since that decision, "a clear-cut consensus has emerged that if an employee or agent is acting on behalf of his or her employer or principal, then no action for tortious interference will lie." *DiMaria Constr., Inc. v. Interach*, 799 A.2d 555, 568 (N.J. Super. Ct. App. Div. 2001), *aff'd*, 797 A.2d 137 (N.J. 2002) (collecting cases). "If, on the other hand, the employee or agent is acting outside the scope of his or her employment or agency, then an action for tortious interference will lie." *Id.* (collecting cases).

Here, it is undisputed that Bubba is a member of the BOE and, thus, he cannot be held liable for tortious interference for acts he committed within the scope of his employment with the BOE. The SAC, however, alleges facts sufficient to suggest that Bubba went beyond the scope of his employment, *i.e.*, he "act[ed] for personal motives, out of malice, beyond his [or her] authority, or otherwise not 'in good faith in the corporate interest.'" *Id.*, 799 A.2d at 569 (quoting *Varrallo v. Hammond Inc.*, 94 F.3d 842, 849 n.11 (3d Cir. 1996)). Accordingly, Plaintiff's tortious

13

interference claim may proceed against Bubba for acts committed outside the scope of his employment at the BOE.

### F. Count Seven (False Light) Against Bubba, Casamassina, D'Agati, and O'Mealy

Count Seven will be dismissed with prejudice as against BOE Member Bubba and dismissed only in part as against Booster Club VP Casamassina, Booster Club Secretary D'Agati, and Booster Club President O'Mealy.

To state a claim of false light under New Jersey law, a plaintiff must allege that (1) "the false light in which [he or she] was placed would be highly offensive to a reasonable person" and (2) the defendant had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the [plaintiff] would be placed." *Edmond v. Plainfield Bd. of Educ.*, 171 F. Supp. 3d 293, 315 (D.N.J. 2016) (quoting *Durando v. Nutley Sun*, 37 A.3d 449, 458 (N.J. 2012)). As noted in this Court's *Illiano I* Opinion:

> "Publicity" . . . means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge . . . Thus it is not an invasion of the right to privacy . . . to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons.

*Illiano I*, 2022 WL 4596729, at *6 n.4 (quoting *McNemar v. Disney Store, Inc.*, 91 F.3d 610, 622 (3d Cir. 1996)).

Here, Count Seven will be dismissed in its entirety against Bubba because it is time barred. New Jersey courts apply a one-year statute of limitations to false light claims. *Swan v. Boardwalk Regency Corp.*, 969 A.2d 1145, 1151–55 (N.J. Super. Ct. App. Div. 2009) (holding that false light claims are subject to the same one-year statute of limitations as defamation claims); *see* N.J. Stat. Ann. § 2A:14-3. Plaintiff added Bubba to this action on June 13, 2023, for statements that he

14

allegedly made two-and-a-half years earlier.[7]  Consequently, Count Seven will be dismissed with prejudice against Bubba.

Furthermore, to the extent Count Seven is based on misrepresentations about Plaintiff's book, it will be dismissed as against Booster Club VP Casamassina, Booster Club Secretary D'Agati, and Booster Club President O'Mealy.  The SAC contains no facts to suggest that those misrepresentations were published to "the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *McNemar*, 91 F.3d at 622.

However, the allegations in the SAC plausibly allege that, as part of a concerted effort to get Plaintiff terminated, Defendants Casamassina, D'Agati, and O'Mealy made misrepresentations about Plaintiff's taking monetary kickbacks and attempting to improperly influence the Booster Club elections.  Although, at times, the SAC lacks specificity, several statements regarding Plaintiff's taking monetary kickbacks and interfering with the Booster Club's elections appear to have been made on multiple occasions, including at the December 5–6, 2020 BOE meeting.  Around that time, the SAC alleges, "Defendant Rewick advised Plaintiff that the Booster Defendants accused Plaintiff of improperly attempting to influence the booster club election in order to get Mr. Gilligan"—the person allegedly providing Plaintiff with the monetary kickbacks—"elected [to the Booster Club] for the sole purpose of ensuring his assistant coaches got paid."  (D.E. 47 ¶¶ 233.)  The SAC further alleges that a parent of a WHHS baseball player

---

[7] The fictitious-party rule cannot save Plaintiff's claim against Bubba.  The fictitious-party rule permits a plaintiff to issue a claim against a defendant whose "true name is unknown to the plaintiff." *Greczyn v. Colgate-Palmolive*, 869 A.2d 866, 869 (N.J. 2005).  "The purpose of the rule is to render timely the complaint filed by a diligent plaintiff, who is aware of a cause of action against an identified defendant but does not know the defendant's name." *Id.* (citing *Gallagher v. Burdette-Tomlin Hosp.*, 723 A.2d 1256, 1259 (N.J. Super. Ct. App. Div. 1999), *aff'd*, 747 A.2d 262 (N.J. 2000)).  The fictitious-party rule, however, "does not apply if the plaintiff has properly designated some defendants by fictitious names and then later discovers a cause of action against undescribed defendants whom he then seeks to join.  Nor is the rule applicable where a plaintiff is unaware that an injury was caused by an identifiable defendant." *Id.* (quoting Pressler, *Current N.J. Court Rules*, Comment on *R.* 4:26-4 (2005)).

15

sent an email in May 2021, stating "[t]he past coach did what he did, unethical and all." (*Id.* ¶ 411.) Taken together, these allegations and the inferences that can be drawn therefrom are sufficient to state a claim for false light based on the statements made about Plaintiff's alleged kickback scheme and election interference.

### G. Count Eight (Defamation) Against Defendants Bubba, Casamassina, D'Agati, and O'Mealy

Count Eight will be dismissed with prejudice as against Defendant BOE Member Bubba, and dismissed in part as against Booster Club VP Casamassina, Booster Club Secretary D'Agati, and Booster Club President O'Mealy.

To plead a claim for defamation, a plaintiff must allege: (1) the assertion of a false and defamatory statement concerning another; (2) the unprivileged publication of that statement to a third party; and (3) fault amounting at least to negligence by the publisher. *Ross v. Bd. of Educ. Greater Egg Harbor Reg'l High Sch. Dist.*, 658 F. App'x 97, 100 (3d Cir. 2016) (quoting *DeAngelis v. Hill*, 847 A.2d 1261, 1267–68 (N.J. 2004)). A defamatory statement is one that is false and injurious to a party's reputation. *Taj Mahal Travel, Inc. v. Delta Airlines Inc.*, 164 F.3d 186, 189 (3d Cir. 1998). A plaintiff must plead "when, where, by which defendants and by what words, written or oral, plaintiff was defamed." *Zoneraich v. Overlook Hosp.*, 212 N.J. Super. 83, 514 A.2d 53, 62 (N.J. Super. Ct. App. Div. 1986). Although vague assertions of defamatory statements are insufficient, *see Foy v. Wakefern Food Corp.*, No. 09-1683, 2010 WL 147925, at *6 (D.N.J. Jan. 7, 2010) (dismissing complaint alleging defamatory statement to "third parties"), the plaintiff need only plead facts with enough precision to "provide sufficient notice to [defendant] of the allegations made against [him or her]," *Mangan v. Corp. Synergies Grp., Inc.*, 834 F. Supp. 2d 199, 204 (D.N.J. 2011) (quoting *Cristelli v. Filomena II, Inc.*, No. 99-2862, 1999 WL 1081290, at *3 (D.N.J. Dec. 1, 1999)).

16

Here, as with Count Seven, Count Eight will be dismissed with prejudice as against Bubba because the claim is time barred. *See Swan*, 969 A.2d at 1151–55 (one-year statute of limitations for defamation claims); N.J. Stat. Ann. § 2A:14-3. In addition, to the extent Count Eight is based on misrepresentations about Plaintiff's book, it will be dismissed. The SAC alleges that the statements were accompanied at or around the time the Defendants delivered copies of Plaintiff's book. As the Supreme Court of New Jersey has explained, "Where an opinion is accompanied by its underlying nondefamatory factual basis, . . . a defamation action premised on that opinion will fail, no matter how unjustified, unreasonable or derogatory the opinion might be. This is so because readers can interpret the factual statements and decide for themselves whether the writer's opinion was justified." *Kotlikoff v. The Community News*, 444 A.2d 1086, 1091 (N.J. 1982) (internal citations omitted).

Count Eight may proceed, however, to the extent it is based on Casamassina, D'Agati, and O'Mealy's statements about Plaintiff's kickback scheme and election interference. As discussed in this Court's analysis of Count Seven, the SAC provides sufficient additional detail from which this Court can infer that Casamassina, D'Agati, and O'Mealy led a defamatory campaign against Plaintiff in an effort to get him terminated from his job.

### H. Count Five (Civil Conspiracy) Against Bubba, Casamassina, D'Agati, and O'Mealy

The civil conspiracy claim can proceed against BOE Member Bubba, Casamassina, D'Agati, and O'Mealy. To state a claim for conspiracy under New Jersey law, a plaintiff must plead (1) a combination of two or more persons; (2) a real agreement or confederation with a common design; (3) the existence of an unlawful purpose, and (4) proof of special damages. *Cevdet Aksut Ogullari Koll. Sti v. Cavusoglu*, No. 14-3362, 2018 WL 585542, at *4

(D.N.J. Jan. 29, 2018), *aff'd sub nom. Cevdet Aksut Ve Ogullari Koll. Sti v. Cavusoglu*, 756 F. App'x 119 (3d Cir. 2018).

Here, the SAC adequately alleges that Bubba, while acting outside the scope of his employment with the BOE, conspired with Casamassina, D'Agati, and O'Mealy to tortiously interfere with Plaintiff's employment. As such, Count Five may proceed against those Defendants.

## IV. CONCLUSION

For the reasons set forth above, the Booster Club MTD is **GRANTED IN PART AND DENIED IN PART**, and the BOE MTD is **GRANTED IN PART AND DENIED IN PART**.[8] An appropriate order follows.

                                            */s/ Susan D. Wigenton*
                                         **SUSAN D. WIGENTON, U.S.D.J.**

Orig:   Clerk
cc:     Parties
        James B. Clark, III, U.S.M.J.

---

[8] Should Plaintiff choose to amend the claims that are dismissed without prejudice, he is reminded of his obligation under Rule 8(a)(2) to state a claim that is "short and plain."